**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1619**

JUAN CARLOS AMAYA,

        Petitioner,

    v.

JEFFREY A. ROSEN, Acting Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  September 9, 2020                    Decided:  January 25, 2021

Before THACKER, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

Petition for review granted in part and denied in part and case remanded for further consideration consistent with this published opinion. Judge Quattlebaum wrote the opinion, in which Judge Thacker joined. Judge Richardson wrote a dissenting opinion.

**ARGUED:** Abdoul Aziz Konare, KONARE LAW, Frederick, Maryland, for Petitioner. John Frederick Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Jessica E. Burns, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

QUATTLEBAUM, Circuit Judge:

An alien may seek to avoid deportation by showing a clear probability that, if deported, he will be persecuted because of his race, religion, nationality, political opinion or membership in a particular social group ("PSG"). Relevant here, if an alien claims he will be persecuted because of his membership in a PSG, that PSG must be "particular."

Juan Carlos Amaya, a citizen of El Salvador, seeks to avoid deportation to that country, fearing persecution on account of membership in the PSG "former Salvadoran MS-13 members."[1] Appellant's Br. at 13–16. For that reason, he argued to an immigration judge ("IJ") that his removal from the United States should be withheld.[2] After the IJ denied Amaya's claims, he appealed to the Board of Immigration Appeals ("BIA"). The BIA dismissed Amaya's appeal, determining that the "former Salvadoran MS-13 members" PSG was "too diffuse" to satisfy the particularity requirement. J.A. 4. Assuming we must

---

[1] The parties dispute the precise delineation of the PSG that this Court should review. The government asserts it is "former gang members," whereas Amaya asserts it is "former Salvadoran MS-13 members." *Compare* Appellee's Br. at 13 *with* Appellant's Br. at 13–16. First, we find that Amaya properly raised the PSG "former Salvadoran MS-13 members" in his brief before his immigration hearing, which the IJ admitted into the record. J.A. 75, 431, 436–38. Second, the IJ analyzed this PSG in her decision. Finally, Amaya did not waive review of this precisely delineated PSG by making more generic descriptive references in his brief before the BIA. Therefore, "former Salvadoran MS-13 members" is properly preserved for review here. Amaya also sought relief based on his membership in the PSG "[potential] testifying witness." J.A. 121. Because Amaya never raised this PSG in his brief here, he waived review in this appeal. *See* Fed. R. App. P. 28(a)(8)(A); *Karimi v. Holder*, 715 F.3d 561, 565 n. 2 (4th Cir. 2013). Thus, we will only consider the PSG "former Salvadoran MS-13 members."

[2] Amaya also petitions for review of the BIA's dismissal of his claim for protection under the Convention Against Torture ("CAT").

2

afford *Chevron* deference to the BIA's decision, our question is whether we think the BIA's decision is reasonable. Because we do not, we grant the petition in part and remand on this ground.

## I.

For context, we begin with a brief description of the law governing Amaya's theory of relief—withholding of removal. "Consistent with our country's obligations under international law, Congress has provided that a noncitizen may not be removed to a country" where he will be persecuted or tortured, regardless of the noncitizen's eligibility for asylum. *Guzman Chavez v. Hott*, 940 F.3d 867, 869 (4th Cir. 2019).

The withholding of removal statute provides relief from deportation if the noncitizen shows that his "life or freedom would be threatened . . . because of . . . race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The noncitizen "must show a 'clear probability of persecution' on account of a protected ground." *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011) (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)). This standard is more stringent than the asylum standard because once the noncitizen "establishes eligibility for withholding of removal, the grant is mandatory." *See Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 353–54 (4th Cir. 2006). Although the statute does not define "particular social group," the BIA has set forth three criteria: (1) immutability, (2) social distinction and (3) particularity. *See Matter of M-E-V-G-*, 26 I&N Dec. 227, 237 (BIA 2014). Particularity, which is the focus of this appeal, requires that a PSG has "discrete" and "definable boundaries—it must

3

not be amorphous, overbroad, diffuse, or subjective." *Id.* at 239; *accord Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011).

## II.

Turning now to the pertinent facts and procedural history, Juan Carlos Amaya, a thirty-seven-year-old native and citizen of El Salvador, comes before us with a reinstated removal order. Amaya first came to the United States in 2009 to escape the MS-13 gang, of which he claims he was formerly a member. The government removed Amaya to El Salvador in 2012 pursuant to an IJ's removal order after Amaya was convicted of second-degree assault. Shortly thereafter the same year, Amaya re-entered the United States without inspection. In 2017, U.S. Immigration and Customs Enforcement ("ICE") arrested Amaya at his home in Maryland. ICE reinstated Amaya's 2012 removal order pursuant to 8 U.S.C. § 1231(a)(5). Amaya expressed a fear of persecution and torture in El Salvador and was referred to an asylum officer for a "reasonable fear" determination. *See* 8 C.F.R. § 208.31(b). The asylum officer determined that Amaya possessed a reasonable fear of torture if removed to El Salvador and referred the case to an IJ for withholding proceedings. *See* 8 C.F.R. § 208.31(c), (e). There, Amaya sought withholding of removal based on his membership in the PSG "former Salvadoran MS-13 members." J.A. 431, 436–38.

At his immigration hearing, Amaya was the only witness to testify. He testified that gang members forced him to join the MS-13 gang in 2003 in El Salvador. Once he joined the gang, he paid them $25 weekly and attended meetings, but he did not commit any

4

crimes for them. He received MS-13 tattoos on his arm and chest, some of which he later covered. Amaya testified that he left the gang in 2004 after his daughter was born and is no longer a member. He told some other members who did not have leadership positions that he was leaving the gang. Soon after, gang members began threatening Amaya. They told him they would kill him if they got the chance, and, if he were to go to the police, they would kill his family.

In 2005, Amaya testified that an MS-13 gang member shot Amaya in the foot. The shooter called Amaya a derogatory name referencing his former membership before shooting Amaya. That same day, Salvadoran police arrested the shooter. Amaya verified the identity of the shooter in custody for police. Shortly after Amaya left the hospital, two gang members threatened him at his home. They shoved a gun in his mouth and broke two of his teeth, threatening to kill him if he testified against the shooter. Because Amaya did not testify, the government released the shooter with a restraining order for Amaya's protection. Gang members continued to threaten Amaya for leaving the gang after the shooter's release.

Amaya testified that in 2007, Salvadoran police arrested him for killing three of his soccer friends. The police told Amaya a protected witness had accused him. Amaya alleges the police wanted to find him guilty so that they could imprison him with MS-13 gang members who would kill him. The Salvadoran government detained Amaya for over a year awaiting trial. At trial, the protected witness testified that a police officer had ordered him to accuse Amaya, so the judge released Amaya. In the following year, Amaya claims that

gang members continued to threaten him and accuse him of betrayal. Amaya then fled to the United States.

After the U.S. government deported Amaya in 2012 following his assault conviction, he remained in El Salvador for about a month. First, Amaya stayed with his brother, but, after a few days, gang members identified Amaya, which he claimed put his brother's family at risk. Amaya then tried to stay with his sister and later his parents, but the same thing happened. After a childhood friend tipped Amaya off that gang members were planning to kill him, Amaya fled back to the United States.

The IJ denied Amaya's withholding claim and ordered him removed. The IJ found that Amaya was not a credible witness and that there was insufficient independent evidence to support his withholding claim.[3] In the alternative, the IJ held that the PSG "former Salvadoran MS-13 members" lacked particularity and social distinction. As to particularity, the IJ cited the BIA's decision in *Matter of W-G-R-*, which rejected a similar PSG and guided that "former association . . . will often need to be further defined with respect to the duration or strength" of participation to qualify as a PSG. J.A. 65 (quoting *Matter of W-G-R-*, 26 I&N Dec. 208, 221–22 (BIA 2014)). The IJ noted that this Court had yet to reach the issue but also discussed the reasoning of the Ninth and Eleventh Circuits, both of which found *W-G-R-* reasonable. *See Reyes v. Lynch*, 842 F.3d 1125 (9th Cir.

---

[3] The IJ also denied Amaya's claim for protection under CAT. The IJ held that notwithstanding the adverse credibility determination, the other evidence in the record did not demonstrate it was more likely than not Amaya would be tortured if removed to El Salvador. The IJ noted that police responded to Amaya when a gang member shot him and that Amaya's year-long imprisonment did not constitute torture. On appeal, the BIA concluded there was no error in the IJ's denial of the CAT claim.

2016); *Gonzalez v. U.S. Attorney Gen.*, 820 F.3d 399 (11th Cir. 2016). Turning to Amaya's PSG, the IJ explained that it was too amorphous and thus lacked particularity. The IJ also held that Amaya's PSG was not socially distinct because "it can be difficult for society to determine who belongs to the group." J.A. 67.

Amaya timely appealed the IJ's decision to the BIA, challenging each aspect of the IJ's decision. The BIA affirmed in a single-member decision, holding that even assuming Amaya were a credible witness, he did not show that he was a member of a cognizable PSG because his proposed PSG lacked particularity. The BIA endorsed the IJ's analysis, concluding that the PSG is "too diffuse and thus lack[s] the requisite particularity." J.A. 4. Because it disposed of the withholding claim solely on the particularity issue, the BIA did not address whether the PSG was socially distinct. Amaya timely petitioned this Court for review.

III.

At the outset, it is important to note what is not before us. Amaya challenges several aspects of his removal order and makes arguments relating to his PSG's social distinction, alleged past persecution and persecution nexus. Appellant's Br. at 8–13, 15–20. But even though we review the factual findings related to those decisions under the deferential substantial evidence standard, the BIA did not address any of those issues, and, accordingly, they are not part of the final order of removal. The Immigration and Nationality Act ("INA") limits this Court's jurisdiction to final orders of removal. 8 U.S.C. § 1252(a)(1). Thus, this Court may only reach issues decided by the BIA. *See, e.g.*, *Mulyani*

7

*v. Holder*, 771 F.3d 190, 196 (4th Cir. 2014). We therefore lack jurisdiction to consider any of the other grounds on which the IJ denied relief. *See* 8 U.S.C. § 1252(a)(1). Since the BIA instead only considered the particularity requirement, the only issue before us with respect to Amaya's withholding claim is the narrow question of whether the PSG "former Salvadoran MS-13 members" is sufficiently particular.

A.

Although the particularity requirement does not appear in the statute, the BIA set forth the requirement to ensure that a PSG has "definable boundaries" so that it is sufficiently clear who is in and out of the group. *See Matter of M-E-V-G-*, 26 I&N Dec. at 239. In promulgating this requirement, the BIA explained that a PSG "must not be amorphous, overbroad, diffuse, or subjective." *Id.* Thus, the purpose of the particularity requirement is "to avoid indeterminacy." *Zelaya v. Holder*, 668 F.3d 159, 165 (4th Cir. 2012). This Court has rejected proposed PSGs that share only "amorphous characteristics that neither provide an adequate benchmark for determining group membership . . . nor embody concrete traits that would readily identify a person as possessing those characteristics." *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011) (holding that wealth, Americanization, opposition to gangs and criminal history were amorphous characteristics) (internal citation and quotation marks omitted). By contrast, we have approved of PSGs that are self-limiting. *See Crespin-Valladares*, 632 F.3d at 125 (noting the self-limiting nature of a family unit).

The parties disagree as to whether "former Salvadoran MS-13 members" satisfies the particularity requirement. The government asserts that the PSG is too indeterminate

because it is difficult to ascertain who exactly is a former gang member. It points to Amaya's background as instructive—Amaya does not remember a moment when he officially left the gang, and he never told any gang leader that he was leaving. The government argues this scenario exemplifies why former gang membership is an amorphous description.

Amaya's position, by contrast, is that "former Salvadoran MS-13 members" is sufficiently particular because it refers to a discrete class of persons and has self-limiting components—it excludes all current members of MS-13, all non-Salvadorans, and anyone who has never been a member of MS-13. Amaya thus contends the PSG provides a clear benchmark for who is in the group, therefore satisfying the particularity requirement.

B.

Whether a PSG satisfies the particularity requirement is question of law, which we review de novo. *See, e.g.*, *Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2014). Nonetheless, this Court gives *Chevron* deference to an agency's statutory interpretations of vague terms. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Consistently, both this Court and the Supreme Court have held that we defer to the Executive Branch on matters of immigration, which involve "sensitive political functions that implicate questions of foreign relations." *Saintha v. Mukasey*, 516 F.3d 243, 251 (4th Cir. 2008) (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)). And we have applied that deference to the statutory term at issue here—"particular social group." *Lizama*, 629 F.3d at 446–47 (applying *Chevron* deference to the BIA's interpretation of "particular social group").

9

In determining whether to apply *Chevron* deference here, however, we must consider several preliminary issues. First, the BIA's opinion is a single-member decision. This Court affords *Chevron* deference when "an agency's interpretation is rendered in the exercise of its authority to make rules carrying the force of law." *Martinez*, 740 F.3d at 909 (alterations adopted) (quoting *A.T. Massey Coal Co. v. Barnhart*, 472 F.3d 148, 166 (4th Cir. 2006)). The BIA only exercises its authority to make a rule carrying the force of law when it issues an opinion by a three-member panel or en banc. *See* 8 C.F.R. § 1003.1(g). If a single-member BIA opinion relies on a precedential panel decision, however, we still afford the underlying interpretation *Chevron* deference. *Espinal-Andrades v. Holder*, 777 F.3d 163, 167 (4th Cir. 2015). Although the BIA opinion below is a single-member opinion and thus does not constitute a precedential interpretation, it does rely on a precedential decision that addressed a materially indistinguishable PSG. *See Matter of W-G-R-*, 26 I&N Dec. 208, 221 (BIA 2014). Accordingly, the principles of *Chevron* deference would typically inform our de novo review.

Second, however, the government never sought *Chevron* deference here until oral argument. Normally, we deem a non-jurisdictional argument not raised in one's briefs either waived or forfeited. But this Court in *Sierra Club v. United States Department of the Interior*, suggested that standards of review cannot be waived and that *Chevron* deference is such a standard of review. *Sierra Club*, 899 F.3d 260, 286 (4th Cir. 2018). Thus, *Sierra*

*Club* seemingly implies that we should evaluate whether *Chevron* deference applies, and, if so, apply it, whether or not the parties raise the issue.[4]

Third, although it is established that appellate courts should afford the BIA *Chevron* deference to define vague statutory terms like "particular social group," see *Aguirre-Aguirre*, 526 U.S. at 424, it is less clear we should afford the same deference to legal questions that arise from the application of the definitional requirements the BIA promulgated in defining "particular social group." Specifically, while *Chevron* deference applies to the BIA's articulation of the particularity requirement, we are less certain that it applies to case-by-case applications to that requirement, which is a step removed from

---

[4] Courts and scholars continue to grapple with the circumstances in which *Chevron* deference can be forfeited or waived. *See, e.g.*, *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 21–23 (D.C. Cir. 2019) (holding that an agency cannot waive *Chevron* deference); *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54 (D.C. Cir. 2018) (holding that an agency cannot forfeit *Chevron* deference); *Lubow v. U.S. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015) (holding that a party challenging an agency's interpretation could forfeit an objection to *Chevron* deference); *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1146 (10th Cir. 2010) (en banc) (holding that an agency can waive *Chevron* deference); *Kikalos v. C.I.R.*, 190 F.3d 791, 796 (7th Cir. 1999) (holding that an objection to *Chevron* deference is waivable); *Am. Auto. Mfrs. Ass'n v. Comm'r, Mass. Dep't of Envtl. Prot.*, 31 F.3d 18, 25–26 (1st Cir. 1994) (same); James Durling & E. Garrett West, *May Chevron Be Waived?*, 71 Stan. L. Rev. Online 183, 185 (2019) (arguing that courts should not allow either private parties or the government to waive *Chevron* deference); Note, *Waiving Chevron Deference*, 132 Harv. L. Rev. 1520, 1526–27 (2019) (same). Most circuits have assumed that "*Chevron* deference is not jurisdictional" and therefore can be waived or forfeited. *Neustar, Inc. v. FCC*, 857 F.3d 886, 893–94 (D.C. Cir. 2017). But *Sierra Club* forecloses this logic by equating *Chevron* deference with a standard of review, which courts independently assess. *Sierra Club*, 899 F.3d at 286 ("[P]arties 'cannot waive the proper standard of review by failing to argue it.' . . . We therefore must independently assure ourselves that any statutory interpretation . . . qualifies for *Chevron* review . . . ."). Although this Court may be in the minority on this legal question, as a panel we are bound to follow the precedent established in *Sierra Club*. In any case, we reach the same conclusion here even after affording *Chevron* deference to the BIA because we find its interpretation unreasonable.

filling in the gaps of the statute. *See Reyes v. Lynch*, 842 F.3d 1125, 1137 (9th Cir. 2016) (expressing uncertainty as to whether *Chevron* deference applied to the application of a PSG to the particularity requirement); *cf. Amos v. Lynch*, 790 F.3d 512, 519–20 (4th Cir. 2015) (affording *Chevron* deference to the BIA's ultimate case-specific holding without addressing the validity of the standard itself or the application to that standard).

That is our situation here. The BIA, and the underlying IJ opinion which the BIA adopted, relied on *Matter of W-G-R-* in determining that Amaya's PSG lacked particularity. In *Matter of W-G-R-*, the BIA considered whether a materially indistinguishable PSG from the one here—"former members of the Mara 18 gang in El Salvador who have renounced their gang membership"—met the BIA's previously articulated three-part test for defining a PSG. *Matter of W-G-R-*, 26 I&N Dec. at 221–22. The BIA determined the group did not, concluding it was neither socially distinct nor particular. Regarding particularity, the BIA reasoned that the PSG was "too broad and subjective" because it "could include persons of any age, sex, or background." *Id.* at 221. Because it was "not limited to those who have had a meaningful involvement with the gang," the boundaries of the group were "not adequately defined." *Id.* at 221. The BIA explained:

> For example, it could include a person who joined the gang many years ago at a young age but disavowed his membership shortly after initiation without having engaged in any criminal or other gang-related activities; it could also include a long-term, hardened gang member with an extensive criminal record who only recently left the gang. It is doubtful that someone in the former category would consider himself, or be considered by others, as a "former gang member" or could be said to have any but the most peripheral connection to someone in the latter category. Even if some in the former category might consider themselves "former gang members" in a general sense, this does not mean that they would perceive themselves as part of a discrete group within society or be so perceived. The boundaries of a group

12

> are not sufficiently definable unless the members of society generally agree on who is included in the group, and evidence that the social group proposed by the respondent is recognized within the society is lacking in this case.

*Id.* The BIA offered guidance, in dicta, that former association with a group will "often need to be further defined with respect to the duration or strength of the members' active participation in the activity and the recency of their active participation if it is to qualify as a particular social group . . . ." *Id.* at 222.

Thus, here, the BIA did not rely on *Matter of W-G-R-* to interpret the term "particular social group." It relied on that decision to apply the particularity requirement to "former Salvadoran MS-13 members." Although this seems to present an extension of *Chevron* deference beyond defining ambiguous statutory provisions, we need not determine whether such deference is necessary because, even if it is, we reach the same conclusion. Under *Chevron*, we must examine whether the BIA's actions, including decisions interpreting statutory provisions on a case-by-case basis, are reasonable. *Aguirre-Aguirre*, 526 U.S. at 426. As described below, the BIA's interpretation here was unreasonable. Therefore, we will assume *Chevron* deference applies in our analysis because it does not change our conclusion.

C.

Assuming *Chevron* deference applies, our question is whether the BIA's particularity holding in *W-G-R-* was reasonable. *See Chevron*, 467 U.S. at 843–44; *Aguirre-Aguirre*, 526 U.S. at 426. An interpretation is unreasonable under *Chevron* deference if it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. As evidenced by the word "or," this standard requires us to evaluate the

13

reasonableness of an agency's decision in two distinct ways. *Id.* In reverse order, one is whether the decision is "manifestly contrary to the statute." *Id.* Under that test, the BIA's decision is reasonable. Interpreting "particular social group" to exclude "former Salvadoran MS-13 members" is not "manifestly contrary" to 8 U.S.C. § 1231(b)(3)(A). *Id.*

But under the antecedent requirement set forth in *Chevron*, which the Supreme Court consolidated in *United States v. Mead Corp.* and has consistently reiterated, an agency decision, even if not manifestly contrary to the statute, is still unreasonable if it is "arbitrary or capricious in substance." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *accord Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) ("[U]nder *Chevron* step two, we ask whether an agency interpretation is 'arbitrary and capricious in substance.'" (quoting *Mayo Found. for Med. Ed. & Research v. United States*, 562 U.S. 44, 53 (2011))); *Schafer v. Astrue*, 641 F.3d 49, 61 (4th Cir. 2011). That is what we have here. For the reasons set forth below, the BIA's interpretation was unreasonable.[5]

---

[5] While the PSG in *W-G-R-* is similar to the one Amaya advances, there is an important difference. There, the PSG was "former members of the Mara 18 gang in El Salvador who have renounced their gang membership." *Matter of W-G-R-*, 26 I&N Dec. at 209. Amaya's alleged PSG—former Salvadoran MS-13 members—lacks that qualifying phrase. The ways in which one might renounce membership in a gang could vary widely. For example, one might quietly stop associating with the gang. On the other end of the spectrum, one might publicly condemn the gang. Those differences might make the PSG in *W-G-R-* too amorphous to be particular. But that difference is not relevant to our inquiry because, curiously, the BIA in *W-G-R-* did not address the "who have renounced their gang membership" language. Instead, it focused on the variations in duration and strength of gang membership.

1.

First, the BIA's description of the particularity requirement in *W-G-R-* impermissibly conflates it with the social distinction requirement. "[T]he particularity requirement flows quite naturally from the language of the statute" and is necessary to ensure there is a "clear benchmark for determining who falls within the group." *Matter of W-G-R-*, 26 I&N Dec. at 213–14 (internal citation omitted). As such, particularity is a definitional question—an inquiry meant to ensure there is an "adequate benchmark" for setting the boundaries of the group. *Lizama*, 629 F.3d at 447; *see also S.E.R.L. v. Attorney Gen. United States of Am.*, 894 F.3d 535, 553 (3d Cir. 2018) ("asking whether a reasonable person could look at the proposed definition of a social group and determine who falls within it" in order to determine whether a group is particular); *Matter of M-E-V-G-*, 26 I&N Dec. at 239 (describing particularity as ensuring the group has "discrete" and "definable boundaries"); *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 76 (BIA 2007) (holding that the terms "wealthy" and "affluent" are "too amorphous to provide an adequate benchmark for determining group membership").

Similarly, the social distinction requirement flows from the statute and is necessary to ensure that the PSG is "*perceived* as a group by society." *Matter of W-G-R-*, 26 I&N Dec. at 216 (emphasis in original). Social distinction thus asks whether the "home society actually does recognize that group as being a 'distinct' and identifiable group." *S.E.R.L.*, 894 F.3d at 553.

Critically, the requirements serve distinct purposes, and it is important to consider them separately and with integrity to their purposes. *Matter of W-G-R-*, 26 I&N Dec. at

15

214 ("[T]hey each emphasize different analytical aspects of a 'particular social group,' and it is necessary to address both elements to properly determine whether the group is cognizable under the Act."). The BIA's articulation of particularity in *W-G-R-*, however, fails to do this. More specifically, the BIA claims "there is some overlap" between the particularity and social distinction requirements because both "take account of the societal context specific to the claim for relief." *Matter of W-G-R-*, 26 I&N Dec. at 214. In general, there is nothing unreasonable about overlap among legal elements or requirements. That happens all the time in the law. But what the BIA calls overlap is actually the incorporation of the social distinction requirement into the particularity requirement. According to the BIA, the particularity question is whether "the group can be described in sufficiently distinct terms that it 'would be recognized, in the society in question, as a discrete class of persons.'" *Id.* (quoting *Matter of S-E-G-*, 24 I&N Dec. at 584). If that is true, the particularity inquiry requires an analysis into whether the PSG is an identifiable, recognized group from the perspective of the pertinent society. That inquiry, however, is essentially the same analysis the BIA requires for social distinction. This conflation of the particularity requirement with the social distinction requirement not only creates an analytical muddle but also renders the BIA's third part of the PSG test—social distinction—surplusage.

The BIA offers an example that illustrates this point. It explains that "landowners" in an underdeveloped society "could be sufficiently discrete" to satisfy particularity, but it "would be far too amorphous" in "Canada or the United States." *Matter of W-G-R-*, 26 I&N Dec. at 214–15. Owning land is no less clear a boundary for group membership in the

16

United States than in any other country. It may be a larger group than in other countries, but it is nonetheless easy to discern if someone is a landowner in the United States.[6] Of course, it may be true that landowners are not *perceived* as a distinct social group in the United States, unlike in some other countries. But this has nothing to do with particularity and everything to do with social distinction.

2.

Second, the BIA's flawed particularity articulation informed its rejection of the PSG in *W-G-R-*. In the middle of its particularity analysis, the BIA explained that "evidence that the social group proposed by the respondent *is recognized within the society* is lacking in this case." *Id.* at 221 (emphasis added). Again, that is the wrong question. Particularity is a definitional inquiry that, like immutability, by its very nature is a question of law. *See Martinez*, 740 F.3d at 909 (holding that the immutability requirement is a legal question not dependent on evidentiary determinations); *see also S.E.R.L.*, 894 F.3d at 553 (holding that particularity requires "look[ing] at the proposed definition of a social group" to see if one can "determine who falls within it"). Its analysis involves a careful review of the proposed PSG's language to evaluate whether its boundaries are clear. Put another way, is it evident from the group's description who is in and who is not? As such, and in contrast

---

[6] In this landowner example, the BIA actually seems concerned about the size of the group rather than the indeterminacy of "landowners." But the size of the group has no bearing on the clarity of the group's boundaries. *Matter of W-G-R-*, 26 I&N Dec. at 214–15; *see Reyes*, 842 F.3d at 1135 ("The BIA's statement of the purpose and function of the 'particularity' requirement does not, on its face, impose a numerical limit on a proposed social group or disqualify groups that exceed specific breadth or size limitations.").

17

to social distinction, it should not depend on "evidence" or society's perceptions. *See, e.g.*, *Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) (holding that social distinction requires a case-by-case evidentiary inquiry). That is not to suggest that whether a social group is recognized within a society is unimportant. It is. But it is important to the social distinction analysis. It has no bearing on the particularity analysis, and it was legal error, and thus unreasonable, to consider it.

3.

Third, the BIA unreasonably grounded its rejection of the PSG in *W-G-R-* in part on the fact that it could further subdivide the group in any number of ways—by "age, sex, or background" or by level of "involvement with the gang." *Matter of W-G-R-*, 26 I&N Dec. at 221. We fail to see how this reasoning provides clarity to the group's boundaries, as it only points out that there are smaller parts to any whole. What matters is not whether the group can be subdivided based on some arbitrary characteristic but whether the group itself has clear boundaries.

Here, the boundaries of Amaya's proposed PSG—"former Salvadoran MS-13 members"—are clear. On its face, "former Salvadoran MS-13 members" contains several self-limiting features that provide clear benchmarks for the boundaries of the group. First, the reference to a single notorious gang leaves no ambiguity as to how a "gang" might be defined. Second, the group only includes people of Salvadoran nationality, eliminating many people with MS-13 affiliation from other countries. Third, and most significantly, the group does not include those who never joined the MS-13 gang. All those self-limiting features baked into the definition of the group aid in its determinacy.

18

The government wants us to conclude that because there are gradations in gang involvement, the term "member" is amorphous. But that same argument could be made for any other particular social group and even the other statutorily listed grounds protected from persecution, which the BIA explained "are commonly defined" with enough "specificity" to be "particular." *Matter of W-G-R-*, 26 I&N Dec. at 213. Consider, for example, a claim of persecution as a result of being Catholic. Catholics, of course, vary widely in the time they have been part of that faith as well as in their level of commitment and involvement. Those differences may make it difficult to establish the required nexus of persecution or even whether a petitioner is or is not Catholic. But they have nothing to do with particularity.

The government similarly seeks to cast "former" as amorphous because there are varying ways one can become a former member of a group. Appellee's Br. at 15–16 (explaining how former gang membership could include "those who stopped participating in gang activities but never told anyone, those who told gang leaders they were leaving the gang, those who told a few fellow members they were leaving but then stopped participating, those who left the country or area and never told anyone they were leaving the gang, those who left abruptly, [and] those who gradually scaled back their activities . . ." (citing IJ order)). Indeed, there are many ways one can become a former member of a group, and those differences may be fatal to an argument that the alleged persecution was on account of membership in the PSG. But they are irrelevant to the particularity inquiry. Further specification of how one becomes a former member does not more clearly define the boundaries of the group; instead, it arbitrarily makes the group smaller. It is already

sufficiently clear who is a former member of a group—it is someone who (1) joined the group and (2) is no longer in the group. These terms stand in contrast to other terms this Court has held to be amorphous, like "wealth" and "opposition to gangs," because the terms here provide objective goalposts delineating the boundaries to the group. *Lizama*, 629 F.3d at 447.

Finally, the government argues the difficulty of applying this proposed PSG cuts against the clarity of the group's boundaries. The government points to Amaya's testimony that there was no specific moment he officially left the gang as illustrative of the group's amorphousness. Appellee's Br. at 16. But that issue goes to whether Amaya met his burden that he was actually in the PSG, not the PSG's particularity. A group can be clearly defined and still have difficult applications, no differently than a clear rule can sometimes be difficult to apply. A difficult application does not turn a clear rule into a vague standard. Take tennis, for example. A tennis court has clear lines that indicate when a ball is in or out. Sometimes, however, it is hard to determine whether the ball landed inside or outside the line, either because it moved so quickly or the vantage point was subpar. The difficulty comes from an inability to see where the ball landed, not from an inability to see the line.[7]

---

[7] For decades, professional tennis matches had a chair umpire, with an ideal vantage point of the entire court, as well as several line judges, each assigned to make calls with respect to a single line on the court. Despite the clarity of the court's boundaries, even these professional umpires sometimes made mistakes due to the blistering speeds players hit the ball. In the early 2000s, an instant-replay system, Hawk-Eye, was developed to track the trajectory of a tennis ball as it bounces on the court. Ten high-speed video cameras are mounted around the court, which compile within seconds an image of the precise location the ball bounces. After a series of mistaken line calls by umpires against Serena Williams in her 2004 U.S. Open quarterfinal match against Jennifer Capriati, tennis tournaments

Particularity is no different. Whether an applicant is a member of the group is a factual question for the fact-finder to determine on a case-by-case basis. That decision may sometimes be difficult based on the available evidence. But what matters for particularity is that there are clear lines delineating the boundaries of the group. Here there are.

4.

We are mindful that two of our sister circuits have determined that *W-G-R-* was reasonable, though we are unpersuaded by their reasoning to the extent it is relevant here. In our view, the Ninth Circuit in affirming *W-G-R-* incorrectly treated particularity as an evidentiary question rather than a legal question. *See Reyes*, 842 F.3d at 1137–38 ("The BIA's application of the 'particularity' requirement . . . is reasonable *in light of the absence of record evidence* demonstrating that Salvadoran society recognizes the boundaries of a group comprised of former Mara 18 members who have renounced their membership, regardless of the length and recency of that membership.") (emphasis added). Particularity is not an evidentiary question—it is a legal question to ensure group determinacy. This Court has always treated the particularity question as such, and we think that is the only reasonable characterization of the requirement. *See Temu v. Holder*, 740 F.3d 887, 895–96 (4th Cir. 2014) (considering how "bipolar disorder" is a well-defined medical term with

embraced the Hawk-Eye technology. *See* Chris Broussard, *Williams Receives Apology, and Umpire's Open is Over*, N.Y. TIMES, Sept. 9, 2004. Today, roughly thirty percent of player challenges to umpire calls are reversed after reviewing the Hawk-Eye image. Even Hawk-Eye is not perfect, however—a 3.6 millimeter average error persists. *See* Ashley Fetters, *How Instant Replays Changed Professional Tennis*, THE ATLANTIC, Sept. 12, 2012. Like umpires in tennis, judges must sometimes make difficult determinations based on the evidence before them. Difficult applications, however, do not make the lines, or the rules, imprecise.

identifiable boundaries, as opposed to whether there was record evidence that Guatemalan society recognized the boundaries of those with the disorder). Framing the particularity inquiry as whether there is "record evidence demonstrating that *Salvadoran society recognizes the boundaries of a group*," moreover, impermissibly blends the particularity inquiry with the social distinction inquiry. *Reyes*, 842 F.3d at 1137 (emphasis added).

The Eleventh Circuit similarly held *W-G-R-* was reasonable, but we do not find its analysis relevant here. *See Gonzalez v. U.S. Attorney Gen.*, 820 F.3d 399, 405–06 (11th Cir. 2016) (per curiam). In *Gonzalez,* the Eleventh Circuit was also deferring to *Matter of E-A-G-*, 24 I&N Dec. 591 (BIA 2008), a case not relied upon here. In its analysis, the Eleventh Circuit defers to both *W-G-R-* and *E-A-G-* together and, in our view, does not meaningfully engage with *W-G-R-*'s particularity holding, instead "echo[ing]" the analysis in *E-A-G-*. *Gonzalez,* 820 F.3d at 405–06 (finding "more persuasive the First Circuit's analysis in *Cantarero v. Holder*, 734 F.3d 82 (1st Cir. 2013)," a case that pre-dated *W-G-R-* and analyzed *E-A-G-*). Therefore, we are not moved by either opinion.

5.

The dissent contends that we have not afforded the BIA appropriate deference. It insists the BIA's statement that "evidence that the social group proposed by the respondent *is recognized within the society* is lacking in this case" refers to a second prong of a two-part particularity analysis. It claims that the BIA, in addressing particularity, looks first at whether the proposed group's boundaries are sufficiently defined and then at whether the group has sufficient "intergroup similarity" to be discrete. Dis. Op. at 27. It then contends the BIA determined "former Salvadoran MS-13 gang members" failed the second prong.

22

To the dissent, this determination, even if perhaps not the best approach, was neither arbitrary nor capricious.

There are two problems with this reasoning. First, the BIA has never articulated its particularity analysis in the way the dissent describes it. The BIA did use the concepts of defined boundaries and discreteness in *W-G-R*. But rather than articulating them as separate requirements, it used those words and concepts interchangeably without any analytical distinction. *See Matter of W-G-R-*, 26 I&N Dec. at 214 ("'Particularity' chiefly addresses the question of delineation . . . ."); *Id.* at 221 ("The group as defined lacks particularity because it is too diffuse, as well as being too broad and subjective. As described, the group could include persons of any age, sex, or background. . . . The boundaries of a group are not sufficiently definable unless the members of society generally agree on who is included in the group, and evidence that the social group proposed by the respondent is recognized within the society is lacking in this case. In this regard, the boundaries of the group . . . are not adequately defined. The group would need further specificity to meet the particularity requirement."). If the BIA were in fact employing the analysis the dissent suggests, we should at least be able to determine from its opinion in *W-G-R-* under which supposed prong the PSG lacked particularity. But we cannot, because the BIA had not articulated the test the dissent describes. Instead, the BIA considered whether Salvadorans would view former MS-13 gang members as a discrete group to evaluate whether the definition of the group's boundaries were clear enough. Respectfully, that does not make sense. Whether Salvadorans view former MS-13 gang members as a discrete group has nothing to do with the clarity of the group's boundaries. In addition to not making sense, the BIA's co-

23

mingling of how Salvadorans view the group with the definition of the group's boundaries shows the BIA did not employ the test the dissent attributes to it.

Second, even if the BIA were to adopt such a two-part test, it would necessarily transform particularity into an evidentiary question of how the society views the proposed group. That does not accomplish anything the social distinction requirement does not already account for, and it needlessly muddles an otherwise definitional inquiry with a fact-based evidentiary question.[8]

6.

The BIA is afforded wide latitude in interpreting vague statutory terms like "particular social group." *See Lizama*, 629 F.3d at 446–47. Those interpretations must only be reasonable. *Id.* Our decision today is not intended to hamstring the BIA in its case-by-case decision making process. But it was unreasonable for the BIA to reiterate its three-part test for a PSG and then apply its particularity requirement in a way that disregards and distorts its own test. *See Mead*, 533 U.S. at 227; *cf. Good Fortune Shipping SA v. Comm'r of Internal Revenue Serv.*, 897 F.3d 256, 263 (D.C. Cir. 2018) (holding that an agency must engage in a "sufficiently reasoned analysis" that shows awareness and good reasons for changing a position). There may be other legal problems with the proposed PSG of "former

---

[8] The dissent claims that we have "streamlined and improved on the agency's formulation of its own test." Dis. Op. at 32. But, it is the dissent that unsuccessfully tries to "improve[] . . . the agency's formulation" of particularity by making it a two-part test with separate clear-boundaries and discreteness requirements. *Id.* The BIA has never described the particularity inquiry as the dissent does. And the dissent's attempt to improve the particularity test only makes it "the same thing done over" by making particularity and social distinction "two ways of saying the same thing." *S.E.R.L.*, 894 F.3d at 553.

Salvadoran MS-13 members."[9] But the only issue before us today is whether that PSG lacks particularity. In our view, the BIA's finding that it does is unreasonable. Therefore, we grant this part of Amaya's petition and remand the case to the BIA to address the other grounds of Amaya's withholding claim.[10]

IV.

We grant Amaya's petition in part and remand the BIA's final order of removal. The BIA's determination that "former Salvadoran MS-13 members" lacks particularity is unreasonable, and we thus remand Amaya's withholding claim for the BIA to consider the IJ's other holdings with respect to that claim. But, because the record does not compel a different understanding of the evidence, we deny Amaya's petition for review of his CAT claim. Accordingly, Amaya's petition is

*GRANTED IN PART, DENIED IN PART AND REMANDED.*

---

[9] In addition, one may question the policy basis for providing relief because one chose to join a criminal gang and then withdraw from it. But that is an issue for Congress, not us. Congress expressly excluded certain groups from the protections afforded under the INA. *See* 8 U.S.C. §§ 1158(b)(2)(A), 1231(b)(3)(B). It did not categorically exclude former gang members. We, therefore, are constrained to evaluate whether former gang members qualify as a particular social group.

[10] As to Amaya's CAT claim, when reviewing the denial of such a claim, we review the agency's findings of fact for substantial evidence and legal determinations de novo. *See Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019). Not only does the record evidence fail to compel a contrary finding from the BIA, it instead amply supports the BIA's conclusion. Therefore, we dismiss Amaya's petition for review of the BIA's denial of his CAT claim. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* [the opposite] conclusion, but *compels* it . . . .") (emphasis original).

RICHARDSON, Circuit Judge, dissenting:

This case comes down to whether the agency was *reasonable* in deciding that "former Salvadoran MS-13 members" was not a "particular social group" under the Immigration and Nationality Act. *See* 8 U.S.C. § 1231(b)(3)(A); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). As the majority rightly explains, our own precedent demands that parties cannot waive application of *Chevron* deference, as it is a standard of review. *See* Majority Op. 10–11 (citing *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018)). And *Chevron* deference applies even when the agency "gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'" *INS v. Aguirre–Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 448 (1987)).[1] So the question here is whether the agency reasonably determined that "former gang members" was too diffuse to be a social group with "particularity"? While the majority recites this standard, it then refuses to give the required deference to the agency's chosen "concrete meaning" for what a "particular social group" is. Because I find that the agency could reasonably interpret the statutory language "particular social group" to reach that common-sense conclusion, I respectfully dissent.

---

[1] Reasonable arguments exist for permitting agencies to waive *Chevron* deference, *cf.* Note, *Waiving* Chevron *Deference*, 132 HARV. L. REV. 1520, 1525–26 (2019), and for not applying *Chevron* deference to immigration adjudications, Shoba Sivaprasad Wadhia & Christopher J. Walker, *The Case Against* Chevron *Deference in Immigration Adjudication*, 70 Duke L.J. _(forthcoming 2021) (working copy available at https://ssrn.com/abstract=3662827). But, as our precedent stands, we must apply *Chevron*.

An alien may avoid removal when his life or freedom would be threatened in the country he is removed to because of his "race, religion, nationality, *membership in a particular social group*, or political opinion." 8 U.S.C. § 1231(b)(3)(A) (emphasis added). Faced with ambiguity over what constitutes a "particular social group," the Board of Immigration Appeals interpreted it to require that "the group is (1) composed of members who share a common immutable characteristic, (2) *defined with particularity*, and (3) socially distinct within the society in question." *Matter of M-E-V-G*, 26 I. & N. Dec. 227, 237 (BIA 2014) (emphasis added).

And the agency applies its "particularity" prong by asking two questions: (1) is the group "well-defined" by clear boundaries; and (2) is the group "discrete" in that those within the boundaries form a single coherent group. *See Matter of W-G-R-*, 26 I. & N. Dec. 208, 210, 214 (BIA 2014); *see also Matter of M-E-V-G-*, 26 I. & N. Dec. at 239 (to be particular a group "must not be amorphous, overbroad, diffuse, or subjective"). To answer the first question, we ask whether the definition of the group is linguistically certain in meaning and the boundaries of it are known. *See In re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 75 (BIA 2007) ("The terms 'wealthy' and 'affluent' standing alone are too amorphous to provide an adequate benchmark for determining group membership."). But the second part, the "discreteness" question, requires a judgment about intergroup similarity: Does the linguistic definition encompass a single group or multiple groups (*e.g.*, adults v. professionals v. doctors v. surgeons)? *See W-G-R-*, 26 I. & N. Dec. at 214 (a particular

27

social group cannot be "overbroad" or "diffuse," and should have some "limiting characteristic[s]").[2]

Here, the agency determined that Amaya's chosen group, "former Salvadoran MS-13 members," was not sufficiently particular. J.A. 4. The agency relied on its second aspect of particularity: discreteness. In doing so, the agency found that Amaya's "proposed social group[] [was] too diffuse and thus lack[ed] the requisite particularity to constitute [a] cognizable particular social group[]." J.A. 4.

And because of *Chevron* deference, we ask only whether rejecting this proposed social group because it was not sufficiently discrete is a reasonable interpretation of the statute. That is, could one reasonably conclude that the statutory phrase "particular social group" requires that the group be adequately discrete? A "particular" group is "a single definite . . . set of things or persons, as distinguished from others." 11 OXFORD ENGLISH DICTIONARY 270 (2d ed. 1989); *see also* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 858 (1984) ("a specific subclass in logic falling under some general concept or term"). This suggests, if not requires, that the proposed group must be a single group with shared traits that distinguish that group from others. And as "particular" modifies "social," it must be a social subclass, which indicates that there must be enough similarity to link this group together socially. But no matter if the statutory language mandates such

---

[2] *See also M-E-V-G-*, 26 I. & N. Dec. at 239–40 (a group must be "sufficiently precise" and not "'all encompassing'" (quoting *Escobar v. Gonzales*, 417 F.3d 363, 368 (3d Cir. 2005)); *cf. Matter of S-E-G-*, 24 I. & N. Dec. 579, 584 (BIA 2008) (explaining that "the size of the proposed group may be an important factor in determining whether the group can be recognized"); *Raffington v. INS*, 340 F.3d 720, 723 (8th Cir. 2003) (explaining that a particular social group cannot be "too large [or] too diverse").

28

a requirement, the agency's reading that a "particular social group" must be discrete enough to be identified as a single group within a society, not a conglomeration of social groups, is at least reasonable.

Two other circuits have agreed that the agency's interpretation is reasonable, as the majority points out. *See* Majority Op. 21–22 (citing *Gonzales v. U.S. Att'y Gen.*, 820 F.3d 399 (11th Cir. 2016); *Reyes v. Lynch*, 842 F.3d 1125 (9th Cir. 2016)). Further, even without the benefit of agency guidance, the Ninth Circuit interpreted "particular social group" to require a "cohesive, homogeneous group." *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986); *cf. Bastanipour v. INS*, 980 F.2d 1129, 1132 (7th Cir. 1992) (requiring that the group be "relatively homogenous"). So even accepting that the agency's interpretation is not mandated as the only, or even best, reading of the statute, these decisions support finding the agency's interpretation reasonable.

And reasonable—not clearly right—is all we ask of the agency here: Could the agency reasonably conclude that a social group comprised of former gang members lacks the intergroup similarity to constitute a "discrete" group of persons? Former gang members may include individuals who were in the gang for only a short time, individuals who took leadership positions, individuals who were threatened upon their departure, individuals who aged out of the gang, and individuals who disassociated for religious reasons. *See* J.A. 67; *see also* J.A. 307 (describing the ways members can leave an El Salvadoran gang). All those individuals have a different experience, and it would be reasonable to conclude that an ordinary Salvadoran citizen may not consider them a "discrete" subclass of people.

29

Regardless of my own views, it seems at least reasonable for the agency to conclude that such a group lacked particularity.[3]

The majority also accuses the agency of allegedly "conflating" the particularity requirement with the social distinction requirement. Majority Op. 15. I cannot agree that what the agency did was so objectionable as to render it unreasonable. As the agency acknowledges, there is overlap in the two requirements. *See W-G-R-*, 26 I. & N. Dec. at 214. Social distinction looks to whether the group would be "*perceived* as a group by society." *Id.* at 213 (emphasis in the original). And, at least under the agency's interpretation, particularity asks whether the group is "discrete" *in the society at issue*. *Id.* at 214. Thus, in determining whether a social group qualifies as a "particular social group," the agency looks to the relevant society when evaluating the discreteness component of the particularity requirement *and* when evaluating the social distinction requirement. The majority, with no apparent legal support, finds this overlap impermissible and would require that these two requirements be wholly separate inquiries. While the majority might prefer that the two inquires not overlap, nothing about the overlap renders the agency's preferred interpretation unreasonable.

That the agency's particularity and social distinction factors overlap does not make the factors unreasonable. The very nature of multi-factor tests virtually ensures that the

---

[3] In this Circuit we have upheld a Board of Immigration Appeals decision that a similar social group lacked particularity. *See Zelaya v. Holder*, 668 F.3d 159, 166–67 (4th Cir. 2012) (affirming the decision that young Honduran males who refused to join gangs, notified the authorities, and had an identifiable tormentor within the gang lacked sufficient particularity to be a "particular social group").

30

inquiries often overlap and consider similar evidence. That is particularly true where the multi-factor test derives from a single statutory phrase, as it does here with "particular social group." And we do not find our own tests unreasonable just because several factors overlap. *See, e.g.*, *United States v. McBride*, 676 F.3d 385, 396 (4th Cir. 2012) (acknowledging that the first and second factors of a four-factor test for determining admissibility of prior "bad acts" evidence "embody overlapping concerns [and] are often considered in tandem"); *Jones v. Virginia Oil Co.*, 69 F. App'x 633, 636, 638 (4th Cir. 2003) (acknowledging that the factors of the "primary duty" test of the FLSA "overlap to a certain extent and are easily examined together").

Nor is the overlap as significant as the majority suggests. As discussed above, the particularity requirement has two parts: (1) the group must be defined with known boundaries, and (2) the group must be a "discrete" class of persons. *See W-G-R-*, 26 I. & N. Dec at 210 (quoting *Matter of S-E-G-*, 24 I. & N. Dec at 584). It is true that in answering the discreteness question, we look to whether the objectively reasonable person in society would understand the group to be discrete. *Cf. Miller v. California*, 413 U.S. 15, 24–25 (1973) (considering community standards as part of an objective test for obscenity). But although they both look to that society, the discreteness question differs from the social-distinction inquiry. The "discreteness" question asks whether someone in that society would find the group to have sufficient shared intergroup characteristics to be considered a single social group, while the "distinction" inquiry asks whether the group is seen as somehow different from the rest of society. *See W-G-R-*, 26 I. & N. Dec. at 216–17. So,

31

although both focus on the society in which the individual lives, they are different inquiries, and thus it is not "unreasonable" for the agency to require both.

Though a bit unclear, perhaps the majority's error lies in how it tries to redefine "particularity." The majority at times appears to acknowledge that particularity—at least as defined by the agency—has two parts: "The BIA did use the concepts of defined boundaries and discreteness in *W-G-R*." Majority Op. 23. But while readily discerning these two concepts, the majority faults the agency for not being perfectly clear about it. So the majority decides to collapse the two concepts, limiting "particularity" to "definable boundaries" and leaving "discreteness" to be considered only as a part of the "social distinction" factor. *See* Majority Op. 17–18, 23–24. Although the agency could have considered discreteness when evaluating social distinction, it was not unreasonable to consider it to be part of the particularity inquiry.[4] The majority may well have streamlined and improved on the agency's formulation of its own test. But that is not the role we play. The agency has determined that particularity has two parts, and while one of those parts

---

[4] The group of "landowners" that the majority points to reflects how the agency's and the majority's tests diverge. Majority Op. 16–17. The agency explained that a group of all landowners may be far too diffuse to constitute a particular social group in the United States. *W-G-R-*, 26 I. & N. Dec. at 214–15. Under the agency's test, therefore, it lacks particularity as it is not "discrete." In other societies with restricted land ownership, however, it might be a sufficiently discrete group to constitute a particular social group. *Id.* But under the majority's test, landowners satisfy the particularity standard regardless of location because we can identify who owns land and who does not.

I also question the majority's reliance on the group of "Catholics." Majority Op. 19. Under the agency's interpretation, perhaps that group lacks the sufficient intergroup similarity to meet the particularity requirement. But that should not bother us. I do not purport to divine congressional intent, but it is perhaps precisely because Catholics may not constitute a "particular social group" that "religion" is specifically enumerated in 8 U.S.C. § 1231(b)(3)(A).

32

overlaps with social distinction, it remains its own inquiry.  Perhaps the agency's test is not

the best multi-factor test that one could create to identify a "particularized social group."

But, at least to me and a few other judges, it seems a reasonable one.  I respectfully dissent.