**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1423**

WALTER ROLANDO HERRERA-MARTINEZ,

      Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

      Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 21, 2021                   Decided: January 5, 2022

Before MOTZ, QUATTLEBAUM, and RUSHING, Circuit Judges.

Petition denied by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Motz and Judge Rushing joined.

**ARGUED:** Krystal Brunner Swendsboe, WILEY REIN LLP, Washington, D.C., for Petitioner. Sarah Kathleen Pergolizzi, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jenny Kim, Melody Vidmar, CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION, Washington, D.C.; Madeline J. Cohen, WILEY REIN LLP, Washington, D.C., for Petitioner. Jeffrey Bossert Clark, Acting Assistant Attorney General, Holly M. Smith, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

QUATTLEBAUM, Circuit Judge:

Walter Rolando Herrera-Martinez petitions this Court for review of the Board of Immigration Appeals' denial of his claims for withholding of removal under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture (CAT). He argues that he suffered past persecution and will likely suffer future persecution on account of being a prosecution witness. He also argues that he more likely than not will be tortured if returned to his native country of Honduras, and the Honduran government would acquiesce in that torture. The Board, however, concluded that Herrera-Martinez's withholding claim failed because the particular social group he advanced, prosecution witnesses, was not particular. The Board also rejected his CAT claim, first affirming the Immigration Judge's conclusion that Herrera-Martinez's testimony was not credible. It then determined that Herrera-Martinez failed to show that it is more likely than not he would be tortured if he returned to Honduras and that the Honduran government would acquiesce to such torture. We agree with the Board that the social group prosecution witnesses, at least as proposed by Herrera-Martinez, is not particular. And under the applicable standard of review, we see no error in the Board's decision upholding the Immigration Judge's credibility finding and denying Herrera-Martinez's CAT claim. Therefore, we deny the petition.

I.

A.

Herrera-Martinez, a citizen and native of Honduras, owned a restaurant and a billiards bar in that country with a business partner. Due to the success of his businesses,

2

two narcotraffickers approached him in 2002 with a proposition to sell drugs through the businesses. Herrera-Martinez refused, but the narcotraffickers continued to press him to sell drugs. In response, he reported the narcotraffickers to the police. According to Herrera-Martinez, the police informed the narcotraffickers of Herrera-Martinez's report, after which the narcotraffickers went to Herrera-Martinez's restaurant where they beat him and threatened to kill him if he "ever made any fuss about them again." A.R. 608. The same day, Herrera-Martinez left the restaurant and went into hiding in a nearby town in Honduras. But after hearing that the narcotraffickers had hired a hitman to kill him, he fled to the United States.

B.

Upon entering the United States, Herrera-Martinez turned himself in to immigration officials. Herrera-Martinez's mother hired an attorney to help him in his immigration proceedings. He claims he went to each of his immigration hearings but skipped the last one "because my attorney said to me that if I were to appear to that hearing the Judge was going to give me voluntary departure." A.R. 451. Herrera-Martinez was later deported to Honduras after a policeman, during a traffic stop, noticed an outstanding order requiring his deportation.

Herrera-Martinez stayed in Honduras for five days before returning to the United States. While living in the United States, he claims he lost his key to his apartment and attempted entry through the unlocked sliding-glass door on his balcony. To reach his balcony, he had to climb onto other residents' balconies. According to the arresting officer, however, he found Herrera-Martinez inside another resident's apartment with that

3

resident's cell phone, wristwatch and vehicle keys. Herrera-Martinez pled guilty to burglary of a habitation with intent to commit theft. After serving his sentence, immigration officials deported him.

Herrera-Martinez stayed in Honduras for twice as long as before—ten days—before returning to the United States a third time. During his third stay in the United States, a police officer stopped him for a traffic violation. After that, immigration officials detained Herrera-Martinez for illegal reentry. Based on his testimony to an immigration officer, he received a reasonable fear interview. Herrera-Martinez also submitted an I-589 application seeking withholding of removal and protection under the CAT. Herrera-Martinez's I-589 application led to a hearing before the Immigration Judge.

C.

At his hearing, Herrera-Martinez testified about the events that led him to leave Honduras. He also testified that the narcotraffickers killed his former business partner several years after he left Honduras. He supplied a news article about that murder.

In addition, Herrera-Martinez provided affidavits from family members that he claims show that the narcotraffickers intend to harm him should he to return to Honduras. For example, his brother, Wilmer, stated in his affidavit that the narcotraffickers threatened Herrera-Martinez with death after he reported them to the police. Wilmer swore that he, too, had been approached by the same narcotraffickers, and they once pointed a gun at his head and demanded to know Herrera-Martinez's location. Even though Herrera-Martinez, Wilmer and the narcotraffickers were within a grade or two in the same elementary school,

4

Herrera-Martinez testified that the narcotraffickers did not kill Wilmer because they did not know he was his brother.

Herrera-Martinez further testified that, several years after the death of his business partner, the same narcotraffickers that threatened him also murdered his brother-in-law. His sister, Ada, provided an affidavit about this event. Herrera-Martinez also supplied a news article showing that his brother-in-law had been killed and that one of the narcotraffickers was a suspect in the shooting.

María, the mother of Herrera-Martinez's children and his "former partner," also submitted an affidavit. A.R. 632. She corroborated Herrera-Martinez's testimony that he reported the narcotraffickers to the police and fled to the United States. She did not mention, however, the assault described by Herrera-Martinez. María also said that in the years after Herrera-Martinez left Honduras, she and her children were targeted by the narcotraffickers because of their relation to Herrera-Martinez. She described the narcotraffickers driving up to her car and shooting at her, "fir[ing] around 9 shots." A.R. 632. Although all shots missed María, the bullets shattered the driver's side window of the car. After the shooting, the car continued to follow María. María described her response:

> I crouched down without releasing the steering wheel, and because I knew the road very well I was able to drive home without looking. I arrived home unharmed, but they followed me to my house and asked me if I knew the person who had come to my house to visit.

A.R. 632. To protect herself and her children, she told them Herrera-Martinez was "only a friend" and, according to her, the narcotraffickers then left her and her children unharmed. A.R. 632.

## II.

At the conclusion of the hearing, the Immigration Judge first found that Herrera-Martinez's claims failed to meet his burden for withholding of removal under § 1231. The Judge held that Herrera-Martinez experienced "at best a severe level of harassment," and the death threat he received was "significantly different" from other cases in the Fourth Circuit that recognize a death threat as establishing past persecution. A.R. 381–82. The Judge also determined that Herrera-Martinez did not establish a well-founded fear of future persecution. In making this decision, the Judge mentioned "credibility issues," but explained that, beyond credibility, Herrera-Martinez still did not show persecution on account of any of his claimed protected grounds. A.R. 382. The Immigration Judge found it "unclear as to what particular social group [Herrera-Martinez] . . . articulated" but found "business owners in Honduras," "business owners who refuse to cooperate with narcotraffickers," "people who refuse to cooperate with narcotraffickers" and "business owners who refuse to cooperate with narcotraffickers" were not particular social groups. A.R. 383–84.

The Immigration Judge also denied Herrera-Martinez's CAT claim because he did not meet his burden to prove that Honduran government officials would acquiesce in his alleged torture. The Immigration Judge noted that the passage of almost twenty years from Herrera-Martinez's confrontation with the narcotraffickers made him skeptical that Herrera-Martinez was at risk of harm, and Herrera-Martinez's own news articles—which reported police efforts to combat the narcotraffickers—contradicted his assertion that the police would acquiesce to his torture.

Herrera-Martinez appealed that decision to the Board, which affirmed the Immigration Judge on the § 1231 withholding claim solely on the issue of Herrera-Martinez's alleged particular social group. The Board agreed with Herrera-Martinez's argument that the Immigration Judge did not consider the group of prosecution witnesses, but nevertheless held that prosecution witnesses lacked particularity. However, with respect to the CAT claim, the Board found that the Immigration Judge had not considered Herrera-Martinez's testimony that, after he left Honduras, the narcotraffickers continued to threaten him indirectly and harmed people close to him. Moreover, the Board explained that "[w]hile the Immigration Judge noted that [Herrera-Martinez's] claim has 'credibility issues,' the Immigration Judge did not explicitly determine that [his] claim lacked credibility." A.R. 75. Thus, the Board remanded the case, in part, to the Immigration Judge to make a credibility determination and to consider the effects of Herrera-Martinez's testimony on his CAT claim.

On remand, the Immigration Judge found Herrera-Martinez not credible based on "a large number of inconsistencies and implausibilities that cast significant doubt on the veracity of [Herrera-Martinez]'s claims." A.R. 65. Specifically, the Immigration Judge noted that Herrera-Martinez testified at his hearing that the narcotraffickers physically harmed him, but he had not mentioned any physical harm in his reasonable fear interview or initial I-589 form. The Immigration Judge stated that it was understandable that Herrera-Martinez might be stressed during an asylum interview and removal proceedings, but that did not explain the omission of physical harm when he prepared the I-589 with the help of his sister. The Immigration Judge also found that (1) Herrera-Martinez testified that he and

his family moved following the threats from the narcotraffickers but offered inconsistent locations as to where they hid, (2) Herrera-Martinez provided inconsistent dates for the murders of his business partner and brother-in-law, (3) Herrera-Martinez did not introduce his brother-in-law's death certificate or other evidence confirming that the murder victim described in news articles was his brother-in-law, (4) Herrera-Martinez submitted news articles that differed from his testimony that the local police were working with the narcotraffickers, (5) Herrera-Martinez testified that the narcotraffickers did not know about the relationship between Herrera-Martinez and his brother, but that was not plausible since they attended the same school and were only one year apart, (6) María's description of the circumstances of the narcotraffickers' attack on her was not plausible and (7) Herrera-Martinez's testimony concerning his criminal history was inconsistent with the official arrest and conviction records.

The Immigration Judge then turned to consider Herrera-Martinez's CAT claim. The Immigration Judge found that because Herrera-Martinez's CAT claim was "primarily based on his testimony regarding country conditions in his town, rather than objective country conditions evidence . . . ; the adverse credibility finding weigh[ed] particularly heavily against him." A.R. 69. The Immigration Judge held that Herrera-Martinez had "fail[ed] to present credible evidence that he will be tortured or killed upon removal to Honduras." A.R. 70. But even if Herrera-Martinez had met his burden to show that it was more likely than not that he would be tortured or killed upon removal to Honduras, the Judge found that Herrera-Martinez also failed to show that the Honduran government would acquiesce to his torture. The two news articles submitted by Herrera-Martinez, the

Judge reasoned, contradicted his claim that the police would acquiesce to his torture because the articles detailed the police responding to the murders of Herrera-Martinez's former business partner and brother-in-law.

Herrera-Martinez again appealed to the Board. This time, the Board adopted the Immigration Judge's adverse credibility determination and added its own discussion of the evidence in the record. The Board agreed that Herrera-Martinez's failure to mention any physical harm from the narcotraffickers in his reasonable-fear interview and I-589 application was "an appropriate basis for an adverse credibility finding." A.R. 4. It also explained that Herrera-Martinez's testimony contained discrepancies regarding the location of his family following the narcotraffickers' threats and inconsistent dates regarding the death of his brother-in-law and business partner. The Board rejected Herrera-Martinez's contention that the affidavits he provided corroborated his story since they were all from friends and family and not independent evidence. And it additionally found that María's affidavit testimony was not plausible. The Board then affirmed the Immigration Judge's dismissal of Herrera-Martinez's CAT claim because Herrera-Martinez did "not identify sufficient independent evidence to rehabilitate his discredited testimony or independently satisfy his burden of proof" and dismissed the appeal. A.R. 6.

Herrera-Martinez timely petitioned this Court for review. We have jurisdiction to review Herrera-Martinez's petition under 8 U.S.C. § 1252(b).

9

Herrera-Martinez argues that both the Immigration Judge's adverse credibility finding and the Board's decision affirming that finding are erroneous because they cherry-picked a few inconsistent statements in Herrera-Martinez's testimony and ignored reasonable explanations for such inconsistencies to discredit his testimony. He argues that the Board erred in rejecting prosecution witnesses as a particular social group because the group is sufficiently particular, as this Circuit, the Third Circuit and the Ninth Circuit have recognized. Moreover, Herrera-Martinez insists that his testimony shows he suffered past persecution on account of being a member of the group, prosecution witnesses, and that he has likewise demonstrated a well-founded fear of future persecution should he be removed to Honduras.

Herrera-Martinez also argues that the Board and Immigration Judge erred in rejecting his CAT claim because they each relied solely on the adverse credibility determination in finding that Herrera-Martinez failed to show he was more likely than not to suffer torture upon removal. According to Herrera-Martinez, the Board erred in disregarding the affidavits from his family members and from María, which corroborate his testimony, as well as the hundreds of pages of country reports and news articles showing corruption between the police and narcotraffickers in Honduras.

A.

We begin with Herrera-Martinez's challenge to the Board's denial of his withholding claim under § 1231. For context, we give a brief description of the law governing withholding of removal. "Consistent with our country's obligations under

international law, Congress has provided that a noncitizen may not be removed to a country" where he will be persecuted or tortured, regardless of the noncitizen's eligibility for asylum. *Guzman Chavez v. Hott*, 940 F.3d 867, 869 (4th Cir. 2019), *rev'd on other grounds by sub nom. Johnson v. Guzman Chavez*, 141 S. Ct. 2271 (2021).

"The withholding of removal statute provides relief from deportation if the noncitizen shows that his 'life or freedom would be threatened . . . because of . . . race, religion, nationality, membership in a particular social group, or political opinion.'" *Amaya v. Rosen*, 986 F.3d 424, 426–27 (4th Cir. 2021) (citing 8 U.S.C. § 1231(b)(3)(A)). The noncitizen "must show a 'clear probability of persecution' on account of a protected ground." *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011) (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)). "Although the statute does not define 'particular social group,' the [Board] has set forth three criteria: (1) immutability, (2) social distinction and (3) particularity." *Amaya*, 986 F.3d at 427 (citing *Matter of M-E-V-G-*, 26 I&N Dec. 227, 237 (BIA 2014)).

In his decision, the Immigration Judge denied Herrera-Martinez's withholding claim for multiple reasons. But on appeal, the Board's only ground for rejecting Herrera-Martinez's proposed group was a lack of particularity. In later proceedings, neither the Immigration Judge nor the Board addressed the withholding claim. As a result, the only issue we review with respect to the § 1231 withholding claim is the Board's decision that

"prosecution witnesses" is not sufficiently particular to qualify as a particular social group. *Yanez-Marquez v. Lynch*, 789 F.3d 434, 461 n. 14 (4th Cir. 2015).[1]

Particularity is a question of law. *Amaya*, 986 F.3d at 429. Thus, we review the Board's holding de novo. *Id.*

"Although the particularity requirement does not appear in the statute, the [Board] set forth the requirement to ensure that a [particular social group] has 'definable boundaries' so that it is sufficiently clear who is in and out of the group." *Id.* (citing *Matter of M-E-V-G-*, 26 I&N Dec. at 239). "In promulgating this requirement, the [Board] explained that a [particular social group] 'must not be amorphous, overbroad, diffuse, or subjective.'" *Id.* (quoting *Matter of M-E-V-G-*, 26 I&N Dec. at 239). Thus, the purpose of the particularity requirement is "to avoid indeterminacy." *Zelaya v. Holder*, 668 F.3d 159, 165 (4th Cir. 2012). "This Court has rejected proposed [particular social groups] that share only 'amorphous characteristics that neither provide an adequate benchmark for determining group membership . . . nor embody concrete traits that would readily identify a person as possessing those characteristics.'" *Amaya*, 986 F.3d at 429 (citing *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011) (holding that wealth, Americanization, opposition to gangs and criminal history were amorphous characteristics)). "By contrast, we have approved of [particular social groups] that are self-limiting." *Amaya*, 986 F.3d at

---

[1] "Under *Chenery*, generally we may only affirm on the grounds relied upon by the Board and may not affirm on unstated alternate grounds." *Yanez-Marquez v. Lynch*, 789 F.3d 434, 461 n.14 (4th Cir. 2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)).

429 (citing *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) (noting the self-limiting nature of a family unit)).

To assess Herrera-Martinez's argument, we must first pin down the particular social group of which he claims to be a member. That should not be a difficult thing to do. But here Herrera-Martinez has advanced several potential groups. In his petition to us, Herrera-Martinez alleges that he is a member of the group prosecution witnesses. Despite that, in the very same petition, he alleges that he also belongs in the group of "[persons] . . . who sought to assist law enforcement against narcotraffickers" and "witnesses who file police reports." Petitioner's Br. 23. Before the Board, he alleged the following groups: "prosecution witnesses," "prosecution witnesses against narcotraffickers," "those who report criminal activity of narcotraffickers to the police," "those whose police reports against narcotraffickers are leaked by the police to the narcos," and "Honduran small business owners who report the criminal activity of narcotraffickers perpetrated against them to the police and the police leak both the fact [that] the report was made and also the identity of the reporter such that the narcotraffickers become aware of these facts." A.R. 130. Before the Immigration Judge, Herrera-Martinez proposed many of the groups listed above and included the group of "those who report the criminal activity of narcotraffickers to the police and are willing to be prosecution witnesses." A.R. 581 n.136.

Making matters more confusing, Herrera-Martinez often shifts from one group to the other, depending on which is more advantageous at the time. At other times, he adds qualifying language to "prosecution witnesses" either from the facts of the case or one of

13

his alternative groups. Frankly, it is difficult to know precisely what group Herrera-Martinez seeks to advance.

But notwithstanding the different groups advanced by Herrera-Martinez, and his efforts to shift among and add limiting language to those groups, the Board addressed only the proposed group "prosecution witnesses." A.R. 74. And in his petition, Herrera-Martinez does not argue that the Board failed to consider any of his proposed groups. Instead, he argues the Board erred in concluding that prosecution witnesses is not a particular social group. *Compare* Petitioner's Br. 17 *with* A.R. 130 (arguing before the Board that the Immigration Judge failed to consider two of Herrera-Martinez's proposed groups). Thus, we review the group prosecution witnesses. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 271 (4th Cir. 2019) ("Nonetheless, '[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.'") (quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)).

Having concluded that the particular social group at issue is prosecution witnesses, we proceed to discuss whether that group meets the particularity requirement. This issue is unsettled in our Circuit. In *Crespin-Valladares*, we recognized the particular social group of "family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses." 632 F.3d at 120–21, 126. Herrera-Martinez insists this decision supports his position that prosecution witnesses is a particular social group. And at first blush, it seems that it does. But closer inspection reveals that the particularity analysis in *Crespin-Valladares* focused on the characteristic of "family relationship," which, we held,

14

was not amorphous. *Id.* at 125 ("The family unit . . . possesses boundaries that are at least as 'particular and well-defined' as other groups whose members have qualified for asylum."). What's more, the group of prosecution witnesses the petitioners referenced in *Crespin-Valladares* was cabined by limiting language. There, the petitioners used limiting language to describe the public nature of the witnesses' testimony and the type of prosecution that the witnesses assisted, referring to "those who actively oppose gangs in El Salvador by agreeing to be prosecution witnesses." *Id*. at 120-21. Importantly, we did not analyze whether prosecution witnesses, without limiting language, the group we now address, was particular. *Solomon-Membreno v. Holder*, 578 Fed. App'x 300, 307 (4th Cir. 2014) (Wynn, J., concurring) ("In *Crespin-Valladares*, . . . [w]e did not reach the question of whether prosecution witnesses, themselves, constitute a particular social group.").

Since *Crespin-Valladares*, we have discussed, in dicta, the group prosecution witnesses on a couple of occasions. Judge Floyd, in a concurring opinion in *Zelaya*, stated:

> It should be noted that the proposed group in *Crespin*[-*Valladares*] included only *family members* of [prosecution witnesses against gangs] and not the witnesses *themselves*. However, to my mind, if the family members of witnesses are deemed socially visible and particular, the witnesses themselves—a more particular *and* socially visible and smaller class of people—must, *a fortiori*, meet those requirements as well.

668 F.3d at 169 (Floyd, J. concurring, joined by Davis, J.) (quoting *Henriquez-Rivas v. Holder*, 449 Fed. App'x 626, 632 n.5 (9th Cir. 2011)); *see also Solomon-Membreno*, 578 Fed. App'x at 307 (Wynn, J., concurring) ("Like Judge Floyd and Judge Davis, I would read *Crespin-Valladares* 'to indicate that such a group satisfies [the relevant criteria] in the same manner that family members of prosecution witnesses against gangs do.'" (citing

*Zelaya*, 668 F.3d at 169)). But he then explained that the particular social group at issue in *Zelaya* was "broader and more amorphous than a group consisting of individuals who have testified for the government in formal prosecutions of gangs." *Zelaya,* 668 F.3d at 169. This language is consistent with our clarification that prosecution witnesses in *Crespin-Valladares* was limited to those who publicly testify against gangs.

Later, in *Temu v. Holder*, 740 F.3d 887 (4th Cir. 2014), we noted that the group in *Crepin-Valladares* "qualife[d] as a particular social group," but noted "[e]ach component of the group . . . might not have particular boundaries." 740 F.3d at 896. We suggested that "'[p]rosecutorial witnesses' might reach too broad a swath of individuals" to meet the particularity requirement. *Id.*

Since those decisions—*Temu*, *Zelaya* and *Solomon-Membreno*—we have not clarified whether prosecution witnesses, without limiting language, is a valid particular social group. Today, that question is squarely before us, and we take this opportunity to answer it.

Without any limitations, the group prosecution witnesses has no clear boundaries and thus fails for lack of particularity. This is evident from an examination of the two words in the proposed group. Take first the noun "witnesses." Black's Law Dictionary provides two definitions for witness: "1. Someone who sees, knows, or vouches for something . . . [or] 2. Someone who gives testimony under oath or affirmation (1) in person, (2) by oral or written deposition, or (3) by affidavit." *Witness*, Black's Law Dictionary (11th ed.

16

2019).[2] Under one definition, a witness must merely have knowledge about an event. Under the other, a witness must testify under oath. These dictionary definitions comport with the common understanding of the word, witness, and both meanings of the word are regularly used.

Well then, does adding the adjective "prosecution" to "witnesses" clarify the meaning and provide for clear boundaries? It does not. Both definitions of "witnesses" still make sense when modified by "prosecution." A prosecution witness could be a witness who actually testifies or one who merely has knowledge about an event.

In fact, the inclusion of "prosecution" only adds to the confusion. What actually does it mean to be a prosecution witness? Is it enough for the prosecution to know about the witness? Or must the prosecution actually call the witness to testify? Does reporting a matter to the police, where the prosecution is not present, count? What about participating in a police line-up? Does an anonymous tipster qualify? Again, there is simply no way to know.

---

[2] Other dictionaries contain essentially the same definitions for "witness" as Black's. The Oxford English Dictionary lists numerous definitions for witness, including: attestation of a fact, event or statement; testimony, evidence; evidence given in a court of justice; the action or condition of being an observer of an event; testimony by signature, oath, etc.; one who gives evidence in relation to matters of fact under inquiry, specifically one who gives or is legally qualified to give evidence upon oath or affirmation in a court of justice or judicial inquiry; one who is called on, selected, or appointed to be present at a transaction, so as to be able to testify to its having taken place and one who is or was present and is able to testify from personal observation. *witness, n.*, Oxford English Dictionary (saved as ECF opinion attachment). Webster's defines witness as attestation of a fact or event; one that gives evidence, specifically one who testifies in a cause or before a judicial tribunal, one asked to be present at a transaction so as to be able to testify to its having taken place; one who has personal knowledge of something and something serving as evidence or proof. *witness*, Merriam-Webster (saved as ECF opinion attachment).

The whole point of the particularity requirement is to ensure that a proposed group has clear boundaries. But that is impossible if the words used to describe the group, given their surrounding context, carry multiple meanings. Because "prosecution witnesses" has multiple meanings, there is no way to know who is in and who is out of that proposed group. As such, it is not particular.

Herrera-Martinez seems to recognize that the group prosecution witnesses, with no limiting language, lacks clear boundaries thus creating a particularity problem. As a result, he argues that prosecution witnesses is limited by the other groups raised in his brief: "[persons] . . . who sought to assist law enforcement against narcotraffickers" and "witnesses who file police reports." Petitioner's Br. 23. But the Board did not consider if prosecution witnesses *who sought to assist law enforcement against narcotraffickers* or prosecution witnesses *who file police reports* were particular social groups. It considered the group prosecution witnesses, and that is the group Herrera-Martinez asks us to consider in his petition.

Undeterred, Herrera-Martinez argues that "a majority of circuits to evaluate this issue have determined that prosecution witnesses as a group is sufficiently particular." Petitioner's Br. 24. In support of this assertion, he cites to the Ninth Circuit's decision in *Henrique-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013), and the Third Circuit's decision in *Guzman Orellana v. Attorney General United States*, 956 F. 3d 171 (3rd Cir. 2020). Despite Herrera-Martinez's assertion to the contrary, those cases involved different alleged particular social groups. *Henrique-Rivas* involved persons who publicly testified against gang members, 707 F.3d at 1093, and *Guzman Orellana* involved witnesses who publicly

18

provided assistance to law enforcement against major gangs, 707 F.3d at 178. Neither of these decisions, which expressly considered different groups, involved the broader, prosecution witnesses group alleged here. Therefore, they do not help Herrera-Martinez's case. In fact, these cases highlight the problems with his interpretation of prosecution witnesses.

Furthermore, our decision is buttressed by the Board's recent decision in *Matter of H-L-S-A-*, 28 I&N Dec. 228 (BIA 2021). There, the Board held that "[t]he Immigration Judge properly found that the applicant had not established that his proposed group of 'prosecutorial witnesses' was a valid particular social group on this record." 28 I&N at 237. For the reasons set forth above, we agree with the Board that prosecution witnesses

lacks particularity.[3] In fairness, the Board insinuated in that opinion that prosecution witnesses might meet the particularity requirement if it contained certain limiting qualifications. *Id.* at 228. But the only group before us is prosecution witnesses without any such limitations. And despite his continued efforts to shift the phrasing of his alleged particular social group, the Board's ruling only addressed "prosecution witnesses." *Chenery* restricts our review to this group, and we agree with the Board's decision that prosecution witnesses, without any other limitation, is not sufficiently particular because it is not discrete and lacks definable boundaries.

For the reasons described above, we affirm the Board's decision that prosecution witnesses is not a particular social group. And because Herrera-Martinez cannot prevail on

---

[3] The Board issued *Matter of H-L-S-A-* after the parties completed briefing. Although the parties addressed that decision in Rule 28(j) letters, neither party addressed whether we should or should not apply *Chevron* deference to the Board's opinion. This Court gives *Chevron* deference to an agency's statutory interpretations of vague terms. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Consistently, both this Court and the Supreme Court have held that we defer to the Executive Branch on matters of immigration, which involve "sensitive political functions that implicate questions of foreign relations." *Saintha v. Mukasey*, 516 F.3d 243, 251 (4th Cir. 2008) (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)). And we have applied that deference to the statutory term at issue here—"particular social group." *Lizama*, 629 F.3d at 446–47 (applying *Chevron* deference to the Board's interpretation of "particular social group"). Although it is established that appellate courts should afford the Board *Chevron* deference to define vague statutory terms, *see Aguirre-Aguirre*, 526 U.S. at 424, like "particular social group," it is less clear we should afford the same deference to legal questions that arise from the application of the definitional requirements the Board promulgated in defining "particular social group." Framed differently, while *Chevron* deference applies to the Board's articulation of the particularity requirement, does it apply to case-by-case applications of that requirement, which are a step removed from filling in the gaps of the statute? While *Chevron* deference is not needed to reach our result today, if applicable, one could hardly conclude the Board's interpretation of the particularity requirement as applied to prosecution witnesses is unreasonable. Thus, deference would be appropriate.

20

his withholding claim without a valid particular social group, we affirm the Board's decision that Herrera-Martinez has not met his burden for withholding under § 1231(b)(3).

## B.

We now turn to Herrera-Martinez's argument that the Board erred in affirming the Immigration Judge's rejection of his CAT claim. To succeed on a CAT claim, an applicant must show that "'it is more likely than not that he or she would be tortured' in the country of removal." *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 971 (4th Cir. 2019) (quoting 8 C.F.R. § 1208.16(c)(2) (2012)). Torture is "(1) 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person' in a manner that is (2) 'by or . . . with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Id.* (quoting 8 C.F.R. § 1208.18(a)(1)). "Because there is no subjective component for granting relief under the CAT, [an] adverse credibility determination . . . [does] not necessarily defeat [an applicant's] CAT claim." *Camara v. Ashcroft*, 378 F.3d 361, 371 (4th Cir. 2004).

The Board's decision, much like the Immigration Judge's, was based largely on the adverse credibility finding regarding Herrera-Martinez's testimony. Therefore, we will first address the Immigration Judge's adverse credibility finding and then the merits of that finding concerning Herrera-Martinez's CAT claim.

## 1.

An Immigration Judge, as the "trier of fact[,] . . . shall make credibility determinations" in deciding whether an "alien's life or freedom would be threatened." 8 U.S.C. § 1231(b)(3)(C). An alien is not presumed credible. 8 U.S.C. § 1158(b)(1)(B)(iii).

21

When rejecting an applicant's testimony for lack of credibility, the Immigration Judge must "offer specific, cogent reason[s] for doing so," such as "inconsistent statements" or "contradictory evidence." *Dankam v. Gonzales*, 495 F.3d 113, 120–21 (4th Cir. 2007) (citations and quotations omitted). In turn, we limit our review of the adverse credibility finding to "ensuring that substantial evidence supports it." *Ilunga v. Holder*, 777 F.3d 199, 206 (4th Cir. 2015).

When reviewing "[u]nder the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). In action, this means we must "uphold [the adverse credibility determination] unless no rational factfinder could agree with the [finding]." *Temu*, 740 F.3d at 891. We are bound by the agency's factual findings unless "any reasonable adjudicator would be *compelled* to conclude to the contrary." *Tang v. Lynch*, 840 F.3d 176, 180 (4th Cir. 2016) (emphasis added) (quoting 8 U.S.C. § 1252(b)(4)(B)).

With those standards in mind, we affirm the Board's decision because there is substantial evidence in the record to support the adverse credibility finding.[4] The Immigration Judge found it significant that Herrera-Martinez did not mention suffering physical harm at the hands of the narcotraffickers in either his reasonable-fear interview or his initial I-589 but did testify about it during his hearing. The Immigration Judge considered Herrera-Martinez's explanations of this omission—that he was nervous during the interview and did not understand the question—but rejected those explanations because Herrera-Martinez later admitted that he understood the question. Moreover, Herrera-Martinez's initial I-589 application included a description of his plight that spanned seven pages, and the Immigration Judge found it implausible that Herrera-Martinez, at his own leisure and with the aid of his sister, was too nervous to remember to describe the assault that compelled his flight from Honduras.

The Immigration Judge found that Herrera-Martinez's omission was not a minor inconsistency since it went to the center of his testimony—that the narcotraffickers' assault and threats caused him to fear for his life. Instead, the Immigration Judge found this omission material to Herrera-Martinez's credibility regarding his CAT claim because the narcotraffickers' past infliction of physical pain would make it more probable that they would inflict severe pain or suffering on Herrera-Martinez in the future. *See Djadjou*, 662 F.3d at 275 (holding that an alien's omission of "her purported leadership role lay at the

---

[4] Both the Board's and Immigration Judge's decisions are subject to review since the Board "adopt[ed]" the Immigration Judge's adverse credibility finding and added its own discussion supplementing it. A.R. 4; *Chen v. Holder*, 742 F.3d 171, 177 (4th Cir. 2014).

heart of her claims of past persecution" because she alleged her leadership role was the reason for her persecution).

The Immigration Judge relied on other inconsistencies in Herrera-Martinez's testimony that additionally supported the adverse credibility finding. For example, Herrera-Martinez's testimony contained inconsistencies regarding the location of his family after the narcotraffickers' assault. The Immigration Judge considered Herrera-Martinez's explanation that the discrepancies in the locations Herrera-Martinez testified about were not severe, since the locations were all within three to twelve miles from each other. But the Judge also explained that Herrera-Martinez's testimony that the narcotraffickers were a threat to his family's safety was inconsistent with the fact that, at most, the family moved only twelve miles away to avoid the narcotraffickers.

The Immigration Judge also noted minor discrepancies in Herrera-Martinez's testimony regarding the dates of the deaths of his brother-in-law and former business partner. But the Board noted that the Immigration Judge had not based his adverse credibility finding on those date discrepancies, and, if anything, those discrepancies only added to the conclusion based on the inconsistencies about past persecution.

The Immigration Judge found that Herrera-Martinez failed to offer independent evidence to meet his burden to prove it was more likely than not he would be tortured if he returned to Honduras. The Immigration Judge acknowledged the affidavits and news articles Herrera-Martinez submitted but found that, in many ways, this information increased the incredibility, not the credibility, of his story. In particular, the Immigration Judge found that María's testimony—about driving away from a car that was firing shots

24

at her by crouching down and continuing to drive without looking because she knew the road well—lacked credibility. Likewise, the Judge found incredible her testimony that the narcotraffickers followed her to her house but, after previously firing nine shots at her, decided to leave her alone when she said that Herrera-Martinez was just a friend.

The Immigration Judge also noted that the affidavits were all from family and friends, and as we have previously noted, "affidavits from friends and family . . . [are] hardly the independent evidence" that can corroborate the testimony of a petitioner which has already been deemed incredible. *Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 358–59 (4th Cir. 2006). And even if such testimony were not from friends and family, it would not "compel" the conclusion that Herrera-Martinez's testimony was credible. *See* 8 U.S.C. § 1252(b)(4)(B).

The Immigration Judge offered specific, cogent reasons for his adverse credibility finding. He addressed the explanations offered by Herrera-Martinez and the additional evidence he introduced. Further, in affirming the decision of the Immigration Judge, the Board held that substantial evidence supported the adverse credibility finding. Based on this record, we agree. Therefore, we uphold the adverse credibility determination.

2.

Next, we address the merits of Herrera-Martinez's CAT claim. In reviewing his CAT claim, the Board stated that "the adverse credibility finding weighed heavily against [Herrera-Martinez]." A.R. 6. But the Board did not reject Herrera-Martinez's CAT claim solely on that basis. Rather, the Board determined that Herrera-Martinez "[did] not identify sufficient independent evidence to rehabilitate his discredited testimony or independently

25

satisfy his burden of proof." A.R. 6. The evidence Herrera-Martinez proffered was his own testimony, which was not credible, and the affidavits of his family members, which were either not credible themselves or carried little weight. Moreover, the news articles reporting on his brother-in-law's and former business partner's deaths contradicted Herrera-Martinez's testimony that the police in his town would acquiesce to his torture. The news articles noted that the police responded immediately to both murders and in doing so were subject to violence—the assailants even killed one of the responding officers.

The only other evidence Herrera-Martinez points to in support of his CAT claim are articles and reports about living conditions within Honduras. But "the mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would more likely than not be tortured." *Nolasco v. Garland*, 7 F. 4th 180, 191 (4th Cir. 2021) (quoting *Singh v. Holder*, 699 F.3d 321, 334 (4th Cir. 2012)).

Since Herrera-Martinez's testimony and his family members' testimony was not credible, Herrera-Martinez could not show that he would incur severe pain or suffering upon removal to Honduras. Furthermore, the news articles showed that Honduran government officials would not acquiesce to his torture. Therefore, the Board did not err in finding that Herrera-Martinez had failed to satisfy his burden for withholding of removal under the CAT.

IV.

For the reasons above, we deny Herrera-Martinez's petition for review of the Board's decisions, which affirmed the Immigration Judge's adverse credibility finding and decisions rejecting Herrera-Martinez's § 1231 withholding-of-removal and CAT claims. Accordingly, Herrera-Martinez's petition is

*DENIED.*