**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 22-1463**

―――――――――

CHRISTIAN ALBERTO SANTOS GARCIA,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

―――――――――

On Petition for Review of an Order of the Board of Immigration Appeals.

―――――――――

Argued: March 10, 2023                                    Decided: July 11, 2023

―――――――――

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

―――――――――

Petition for review granted; reversed in part, affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the majority opinion, in which Judge Wynn joined. Judge Quattlebaum wrote an opinion dissenting in part and concurring in part.

―――――――――

**ARGUED:** Jessica Leigh Wagner, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Petitioner. Katie Elizabeth Rourke, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** David Debold, Naima L. Farrell, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Petitioner. Brian M. Boynton, Principal Deputy Assistant Attorney General, Sabatino F. Leo, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

―――――――――

KING, Circuit Judge:

Petitioner Christian Alberto Santos Garcia, a native and citizen of El Salvador, has twice travelled unlawfully into the United States — first in 2012, and again in 2016. In both instances, Garcia fled threats to his life and attacks carried out against him by the 18th Street Gang and the Salvadoran police. After seeking protection from removal before an immigration judge (the "IJ") in 2016, Garcia was afforded relief — in the form of asylum, withholding of removal, and protection under the Convention Against Torture (the "CAT") — by three separate IJ rulings. On each occasion, the Board of Immigration Appeals (the "BIA") reversed the IJ rulings. Garcia, for his part, was removed to El Salvador in May 2022, and has awaited further developments in these proceedings from his home country.

In this appeal, Garcia challenges and seeks reversal of three rulings made by the BIA — those being: (1) that the "particular social group" relied upon in connection with Garcia's application for withholding of removal is not legally cognizable; (2) that Garcia was not persecuted in El Salvador on account of his political opinions; and (3) that Garcia failed to establish eligibility for CAT protection. As explained herein, we grant Garcia's petition for review and reverse the BIA rulings in part, affirm them in part, and vacate them in part. We otherwise remand to the BIA for such further proceedings as may be appropriate.

I.

A.

Garcia was raised by his grandparents in Soyapango, El Salvador, alongside his sisters and cousins.[1] Like other cities in El Salvador, Soyapango has struggled to contain widespread and extreme violence caused by warring criminal gangs, with gangs named MS-13 and the 18th Street Gang being chief among them. In 2012, Garcia's cousin Emily became involved with an 18th Street Gang member named "El Bacha." Emily sought to cut her ties with El Bacha after discovering his gang affiliation, but El Bacha intended to make Emily a "gang girlfriend" and continuously stalked and harassed her in public. *See* J.A. 1307.[2]

Emily advised her cousin Garcia — who was then 15 years old — of her serious and continuing problems with El Bacha and the 18th Street Gang. As he was leaving school one day in November 2012, Garcia witnessed El Bacha and other gang members arguing with Emily and attempting to force her into a nearby house. Fearing that the gang "wanted to hurt [Emily] somehow" and "wanted to abuse her sexually," Garcia intervened, attempting to break up the fight. *See* J.A. 1308. One of the gang members tried to chase Garcia away, telling him to "mind [his] own business" if he "care[d] for [his] life." *Id.* at

---

[1] Our recitation of the relevant facts is drawn from the record on appeal, reflecting the documentary and testimonial evidence considered by the IJ in her rulings. The same IJ, a judge named Stevens, presided over Garcia's immigration proceedings from their inception until his May 2022 removal to El Salvador.

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties to this appeal.

3

1309. Garcia persisted and pulled Emily away from the gang, but the gang members encircled Garcia before he could flee, beating him until an onlooker called the police. Later that day, Emily received a text message from El Bacha advising that she and Garcia would "have a week to leave the country" or else "you're going to be found in a black plastic bag in pieces." *Id.* at 1313. The two cousins took the threat seriously and promptly left El Salvador for this Country.

Garcia and Emily first entered the United States in December 2012. After being briefly detained by the immigration authorities, Garcia was released as an unaccompanied minor to the custody of his mother in Manassas, Virginia, where he and Emily would stay. In Virginia, Garcia attended high school and worked in a variety of jobs to provide support for his family. Little in the way of difficulties occurred until about three years later, in August 2015, when Garcia was arrested for spray-painting graffiti on a fence with friends. By then 18 years old, Garcia was charged with — and pleaded guilty to — two misdemeanor offenses for destruction of property. Thereafter, the Department of Homeland Security (the "DHS") initiated removal proceedings against Garcia, and he was permitted to voluntarily depart the United States and return to El Salvador in April 2016.

Garcia's time back in El Salvador proved to be brief and violent. Shortly after his return, Garcia encountered an 18th Street Gang member who informed him that the gang "still [had] unfinished business" with him and that "[t]he 18th Street Gang may take its time, but it never forgets." *See* J.A. 1318, 1423. Days later, Garcia was approached and attacked by other gang members, who told him to "get out of El Salvador" or else "pay what [he] owed." *Id.* at 1424.

4

The Salvadoran police provided no source of safety to Garcia, instead endangering him further. On one occasion in 2016, the Salvadoran police stopped Garcia in the street, believing him to be a member of MS-13. The officers took Garcia into a bakery, handcuffed him to a chair, placed a plastic bag over his head, and beat him, seeking to obtain information about his supposed affiliation with MS-13. Garcia was released only after an English-speaking officer intervened. Later, outside of his home, Garcia encountered one of the officers who had attacked him — a man known as "El Sol," who was a member of El Salvador's so-called "anti-gang death squads." *See* J.A. 2366. After Garcia rebuffed a command to go inside, "El Sol" beat Garcia in the head with a police radio.

Garcia's troubles went on like this, back and forth between the police and the gang, for a few months. Not long after the incident with "El Sol," Garcia was surrounded by 18th Street Gang members in a public park and severely beaten with baseball bats and a bike chain. Garcia "completely lost consciousness" during this incident, did not believe that he was "going to be able to make it . . . out alive," and ultimately decided to again flee El Salvador. *See* J.A. 1341. In September 2016, after recovering from his injuries, Garcia escaped from El Salvador and returned to Virginia.

B.

1.

Shortly after reentering the United States, Garcia was arrested for driving without a license and was charged with removability by the DHS, pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) (providing that any person present in the United States without being

5

admitted or paroled is subject to removal).  He first appeared before an IJ in December 2016, at which time he conceded removability and promptly applied for asylum in the United States, withholding of removal from this Country, and protection under the CAT. Garcia was thereafter detained at the Farmville Detention Center in Virginia, where he remained from August 2017 until his removal to El Salvador in May 2022.[3]

a.

In the time period during which Garcia's removal proceedings wound their way through the administrative review process — well over five years by the time of his 2022 deportation — the IJ awarded Garcia relief three times, with the BIA reversing in each instance.  At his first merits hearing before the IJ in November 2017, Garcia declined to testify, invoking the Fifth Amendment and citing unsubstantiated police allegations that he

---

[3] Seeking relief from his protracted period of civil detention, Garcia filed a petition for habeas corpus relief in the Eastern District of Virginia on June 1, 2021.  By his petition, Garcia asserted that his numerous years spent in custody without an individualized bond hearing — or any final resolution of his immigration proceedings — contravened the Fifth Amendment's Due Process Clause.

The district court granted habeas corpus relief, directing the Attorney General to schedule a bond hearing and observing that Garcia had awaited a resolution of his immigration proceedings longer than any immigration detainee who had "ever sought [habeas corpus] relief" from the court. *See Santos Garcia v. Garland*, No. 1:21-cv-00742, 2022 WL 989019, at *6 (E.D. Va. Mar. 31, 2022).  The court emphasized that it was "deeply troubled by the amount of time [Garcia] has been detained" and remarked that "the history of this case is reminiscent of the movie *Groundhog Day* . . . [e]ach day [Garcia] is detained is being taken for granted without any appreciation of the recurring time loop in which [he] remains detained without resolution of his status." *Id.* at *5.  Before the court-ordered bond hearing could be conducted, however, the BIA entered the final orders denying Garcia relief that underlie this appeal, prompting Garcia's May 2022 removal to El Salvador.

6

had been involved in gang activity in the United States earlier that year. In his stead, Garcia's mother, his cousin Emily, and his sister Cristina provided testimony credited by the IJ, explaining Garcia's efforts to protect Emily from the 18th Street Gang and the violent repercussions that he had faced in El Salvador.

The IJ, by decision of December 22, 2017, granted Garcia's application for asylum, concluding in pertinent part that he had suffered past persecution on account of his membership in the "particular social group" of "young male family members of his cousin Emily." *See* J.A. 2885. Recognizing that the immigration courts may grant or deny asylum to otherwise qualified applicants in their discretion, the IJ resolved that Garcia's minimal criminal history did not counsel against an award of asylum, especially as "discretionary denials of asylum are exceedingly rare" and "require egregious negative activity by the applicant." *Id.* at 2888 (quoting *Zuh v. Mukasey*, 547 F.3d 504, 507 (4th Cir. 2008)).

The BIA, however, saw things differently than the IJ. Sustaining the DHS's appeal in June 2018, the BIA ruled that Garcia's "serious criminal conduct" (consisting of his 2015 graffiti offense and unsubstantiated 2017 gang involvement with the 18th Street Gang) rendered him "not deserving of asylum . . . in the exercise of discretion." *See* J.A. 2785. The BIA thus reversed the IJ's grant of asylum and remanded for the IJ's consideration of Garcia's claims for withholding of removal and CAT protection.

b.

In August 2018, the IJ awarded relief to Garcia for a second time, granting his application for withholding of removal. Adhering to the merits of her earlier asylum ruling, the IJ again concluded that Garcia had been persecuted in El Salvador on account of his

7

status as a "young male family member of his cousin Emily," a classification that the IJ accepted as a legally cognizable "particular social group" under this Court's precedent. *See* J.A. 2767. The IJ otherwise denied Garcia's application for CAT protection, ruling that he had not alleged a sufficiently "specific chain of events leading to his torture." *Id.* at 2771. Once more, the DHS appealed the IJ's favorable decision and, on April 5, 2019, the BIA again reversed, explaining that Garcia was required to provide credible testimony in support of his claim for withholding of removal and that he was not entitled to invoke a blanket assertion of the Fifth Amendment.

c.

On remand, Garcia provided extensive testimony before the IJ at an August 2019 hearing. He also filed an unopposed motion to reopen his application for CAT protection, relying on intervening and controlling precedent of this Court that undermined the IJ's earlier CAT ruling.[4] On December 9, 2019, after deeming Garcia's testimony credible, the IJ once again granted his application for withholding of removal, concluding as before that Garcia's proposed "particular social group" of "young male family members of his cousin Emily" was cognizable and that his family connection with Emily was "at least one central reason" that he — and not someone else — was threatened and attacked by the 18th Street Gang. *See* J.A. 1263. The IJ otherwise granted Garcia's motion to reopen his CAT claim

---

[4] Garcia's motion to reopen specifically relied on our decision in *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019), which does not require an applicant for CAT relief to establish a "specific chain of events leading to his torture," as the IJ had ruled in rejecting Garcia's CAT claim in August 2018. *See* J.A. 2771.

8

and also afforded CAT relief to him in the alternative. Taking stock of the extensive abuse that Garcia had suffered at the hands of the gang, his difficulties with the Salvadoran police and the police force's tendency to "arbitrarily arrest[] and detain[]" people suspected of gang activity, as well as the state of gang activity elsewhere in El Salvador, the IJ resolved that Garcia would more likely than not be tortured by the gang, the police, or the Salvadoran "vigilante death squads" if he were returned to his home country. *Id.* at 1270.

The DHS appealed the IJ's third award of immigration relief and, by its decision of March 30, 2021, the BIA reversed the IJ yet again. *See* J.A. 966-70 (hereinafter the "2021 Reversal Order"). As to Garcia's withholding claim, the BIA ruled on the merits that "young male family members of [Garcia's] cousin Emily" was not a valid "particular social group" that could be used as a basis for establishing past persecution. The BIA concluded that Garcia's proposed group was not "composed of members who share a common immutable characteristic," "defined with particularity," or "socially distinct," thus failing to satisfy the factors required by BIA precedent. *Id.* at 967. Declining to address the DHS's remaining appellate contentions regarding the withholding of removal claim (specifically that Garcia's testimony was not credible, and that the IJ had erred in finding that the Salvadoran government was "unable or unwilling to control" Garcia's persecutors), the BIA remanded for the IJ to consider whether Garcia had been persecuted on account of an "imputed anti-gang political opinion," an argument made by Garcia that the IJ had not previously addressed. *Id.* at 968.

Separately, the BIA also concluded in its 2021 Reversal Order that Garcia was not entitled to CAT protection. In that regard, the BIA resolved only that the IJ had relied on

9

insufficient evidence in determining that Salvadoran public officials would "acquiesce" to Garcia's torture, reviewing only two news articles that the IJ had assessed. *See* J.A. 969. The BIA did not consider or discuss any other evidence in the record speaking to the likelihood that Garcia would be tortured if removed to El Salvador, disregarding Garcia's credited testimony about the various attacks that he had faced from the 18th Street Gang — and the police — when he had returned to El Salvador in 2016.

2.

Seeking relief from the IJ for a fourth time, Garcia asserted on remand — as directed by the BIA — that he was entitled to withholding of removal because he had been persecuted by the 18th Street Gang on account of an "imputed anti-gang political opinion." *See* J.A. 397. Garcia specifically maintained that his efforts to prevent the gang from recruiting Emily as a "gang girlfriend" were viewed by the gang as "a political stance" and as a threat to their authority in El Salvador. *Id.* The IJ rejected Garcia's alternative withholding of removal argument in June 2021, however, explaining that Garcia's general speculations regarding the gang's motivations could not prove that they targeted him for "political" reasons. "[T]he evidence of record," the IJ concluded, established only that "the gang sought [Garcia] out and persecuted him in the past as retaliation" for his interference with their activities, not because of Garcia's expression of any inherently political view. *Id.* at 398. Thus denying Garcia's application for withholding of removal — his sole remaining basis for relief — the IJ ordered him removed to El Salvador. *Id.* at 399.

Garcia promptly appealed the IJ's June 2021 "political opinion" remand order to the BIA. By decision of April 26, 2022, the BIA affirmed the IJ's ruling and dismissed

10

Garcia's appeal. *See* J.A. 333-36 (hereinafter the "Dismissal Order"). The BIA therein concluded that the IJ's factual determination that the gang had targeted Garcia as a retaliatory effort — instead of as a political cause — was not clearly erroneous. Crediting the IJ's "reasoned analysis of the relevant record evidence," the Dismissal Order emphasized in particular that the gang's statements about "taking its time" and Garcia's need to "pay for unfinished business" "reflect[ed] a retaliatory desire, rather than a political motivation." *Id.* at 334-35.

Meanwhile, during the pendency of his appeal of the IJ's "political opinion" remand order, Garcia separately moved for reconsideration of the BIA's determination, in its 2021 Reversal Order, that the "particular social group" proposed in connection with his withholding claim — "young male family members of his cousin Emily" — was not legally cognizable. In support of his reconsideration motion, Garcia relied on the vacatur of the Attorney General's 2019 decision in an immigration case called *Matter of L-E-A- II*, 27 I&N Dec. 581 (A.G. 2019), which the BIA had quite heavily relied on in its March 2021 Reversal Order. The Attorney General's decision in *L-E-A- II* had established a heightened standard for assessing the validity of a family-based "particular social group," concluding that, "in the ordinary case, a nuclear family will not, without more," qualify. *See* 27 I&N at 589. Recognizing that the *L-E-A- II* decision was "inconsistent with the decisions of several courts of appeals that have recognized families as particular social groups," the Attorney General in June 2021 reversed his position and vacated *L-E-A- II* in its entirety. *See Matter of L-E-A- III*, 28 I&N Dec. 304, 304-05 (A.G. 2021) (citing, inter alia, *Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011)).

11

On April 26, 2022, the BIA nevertheless denied Garcia's reconsideration motion, satisfied that its March 2021 "particular social group" ruling remained correct, notwithstanding the Attorney General's vacatur of *L-E-A- II* in June of that year. *See* J.A. 3-5 (hereinafter the "Reconsideration Order"). The BIA insisted that it "discern[ed] no error" in its 2021 Reversal Order, concluding once again that, under this Court's precedent, Garcia's proposed group of "young male family members of his cousin Emily" was neither "immutable," "defined with particularity," nor "socially distinct." *Id.* at 4-5.

3.

Garcia filed this petition for review on April 29, 2022, seeking in a timely manner to appeal all three BIA decisions — the 2021 Reversal Order, the Dismissal Order, and the Reconsideration Order. We possess jurisdiction to review each of those BIA orders, pursuant to 8 U.S.C. § 1252(a)(1).[5] On May 2, 2022, Garcia filed a motion for a stay of removal pending appeal, arguing that he would suffer irreparable harm in returning to El Salvador in the absence of a stay. We denied Garcia's stay motion on May 17, 2022. Three

---

[5] Section 1252(a)(1) provides for judicial review of a "final order of removal," and a petition for review of any such order must be filed "not later than 30 days" after the date of the BIA's final order. *See* 8 U.S.C. § 1252(b)(1). Relevant here, when the BIA issues a decision that denies certain claims for relief but remands others to an IJ for further consideration — as occurred with the 2021 Reversal Order — the decision is not yet a "final order of removal." *See Kouambo v. Barr*, 943 F.3d 205, 209 (4th Cir. 2019). The BIA's decision becomes final after the IJ makes a ruling on remand that is reviewed by the BIA with no further remand. *Id.* at 213. That being so, the 2021 Reversal Order became final on April 26, 2022, when the BIA (1) affirmed the IJ's "political opinion" ruling made on remand, and (2) denied reconsideration of the 2021 Reversal Order. Garcia's petition for review in this Court, filed three days later, was thus timely and appropriately seeks review of all three BIA orders.

days thereafter, the immigration authorities removed Garcia to El Salvador, where he awaits resolution of this appeal.[6]

II.

By his petition for review, Garcia requests that we reverse the BIA's 2021 Reversal Order, its Dismissal Order, and its Reconsideration Order, and that we direct the BIA to award him withholding of removal and CAT protection. More specifically, Garcia maintains (1) that the BIA erred in concluding that his proposed "particular social group" is not legally cognizable, and that he is entitled to withholding of removal on the basis of his membership in that group; (2) that the BIA also erred in affirming the IJ's ruling that he was not persecuted on account of his "imputed political opinion," and that he is entitled to withholding of removal on that independent basis; and (3) that the BIA again went awry in reversing the IJ's award of CAT relief, failing to consider the full body of record evidence that Garcia would likely be tortured if he were returned to El Salvador.

The strength of Garcia's appellate contentions is evidenced to some extent by the fact that he was affirmatively awarded immigration relief three times over by the IJ, with such relief repeatedly wiped out by the BIA on peripheral grounds. As explained further below, we grant Garcia's petition for review and reverse the 2021 Reversal Order — as well as the Reconsideration Order — with respect to the BIA's "particular social group"

---

[6] In his administrative proceedings and on appeal, Garcia has been ably represented *pro bono* by lawyers with the firm of Gibson, Dunn & Crutcher. Garcia's counsel have performed admirably, and we are appreciative of their fine service.

13

ruling, in that Garcia's proposed group is undoubtedly cognizable under our precedent.  We affirm, however, the Dismissal Order, because substantial evidence supports the BIA's determination that Garcia was not persecuted on account of any "imputed political opinion."  Lastly, we vacate the 2021 Reversal Order with respect to the BIA's CAT ruling, in that the BIA failed to engage in the requisite evidentiary analysis.  Accordingly, we remand these proceedings to the BIA for further consideration.

### A.

### 1.

### a.

Garcia's principal contention on appeal is that the BIA erred in its 2021 Reversal Order when it ruled that his proposed "particular social group" — that is, "young male family members of his cousin Emily" — was not legally cognizable.  By extension, Garcia also contends that the BIA erroneously denied reconsideration of that ruling.  Maintaining that his proposed group is valid, he requests that we reverse the BIA's "particular social group" ruling and remand for an award of withholding of removal on the basis of his group membership.

We review de novo the BIA's determination of whether a given "particular social group" is legally cognizable.  *See Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2014).  The BIA's denial of Garcia's reconsideration motion, meanwhile, is reviewed for an abuse of discretion, and we may reverse the BIA's Reconsideration Order "only if the [BIA] acted arbitrarily, irrationally, or contrary to law."  *See Narine v. Holder*, 559 F.3d 246, 249 (4th Cir. 2009).  Where, as here, a petitioner challenges the BIA's reconsideration ruling and

14

its underlying ruling, our review of the two "shall be consolidated." *See* 8 U.S.C. § 1252(b)(6). Because we are satisfied that the BIA's "particular social group" ruling was erroneous, it necessarily acted "contrary to law" and abused its discretion in denying reconsideration. *See Narine*, 559 F.3d at 249. Accordingly, we reverse both the 2021 Reversal Order and the Reconsideration Order with respect to the BIA's "particular social group" ruling.

b.

Pursuant to the Immigration and Nationality Act, an applicant for withholding of removal bears the burden of establishing a "clear probability" that, if removed, "his life or freedom would be threatened" — i.e., he would be persecuted — "on account of a statutorily protected status, a list that includes 'membership in a particular social group' as well as race, religion, nationality, and political opinion." *See Salgado-Sosa v. Sessions*, 882 F.3d 451, 455-56 (4th Cir. 2018) (citing 8 U.S.C. § 1231(b)(3)(A)). The "core" of an applicant's eligibility for withholding of removal is the "nexus" between persecution and a protected status, a link that requires showing that the applicant's status is "at least one central reason" for the risk of harm that he faces. *Id.* at 457. Separately, a withholding of removal applicant is obliged to demonstrate that the persecution he fears would be inflicted by either the government or private actors that the government is "unable or unwilling to control." *See Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011).

A "particular social group" will qualify as a "statutorily protected status" that can serve as the basis for a withholding of removal claim when it satisfies three criteria. First, the group's members must "share common, immutable characteristics." *See Lizama v.*

15

*Holder*, 629 F.3d 440, 447 (4th Cir. 2011).  Second, those characteristics must afford group members certain "social visibility" or "social distinction."  *Id.*  And third, the group must be "defined with sufficient particularity to delimit its membership."  *Id.*

Here, discovering the BIA's error in rejecting Garcia's proposed social group of "young male family members of his cousin Emily" is no herculean task.  Social groups based on family ties have been consistently approved by this Court as providing a sound basis for asylum or withholding of removal applications.  *See, e.g.*, *Salgado-Sosa*, 882 F.3d at 457; *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015); *Cedillos-Cedillos v. Barr*, 962 F.3d 817, 824 (4th Cir. 2020).  Indeed, our pivotal 2011 decision on the matter — *Crespin-Valladares v. Holder* — recognized in no uncertain terms that "the family provides a prototypical example of a particular social group."  *See* 632 F.3d at 125.  In tossing out Garcia's proposed social group in March 2021, however, the BIA largely disregarded our precedent, providing no citation to or discussion of *Crespin-Valladares*. The BIA instead relied chiefly on its own then-existing precedent, set forth in the Attorney General's 2019 *L-E-A- II* decision.  As described above, *L-E-A- II* — which was vacated by the Attorney General in June 2021 and thus "lacks legal force" — "conflicted with [this Court's] well-established precedent" recognizing families as cognizable social groups.  *See Perez Vasquez v. Garland*, 4 F.4th 213, 227 n.11 (4th Cir. 2021).  Surprisingly, the BIA paid little mind to *L-E-A- II*'s vacatur in its Reconsideration Order of 2022, doubling down

16

on its earlier "particular social group" ruling and again inexplicably declining to apply *Crespin-Valladares* and its progeny.[7]

Contrary to the BIA, Garcia's proposed social group is readily cognizable under the above-stated framework. With respect to the "immutability" factor, the BIA stated in its 2021 Reversal Order only that "being 'young' . . . is not immutable" because "youth is a characteristic that one ceases to possess through the mere passage of time." *See* J.A. 967. But at any given moment when being targeted by some persecutor, a person cannot change the fact that they are "young" or "male" — indeed, the BIA itself has recognized that "being a young woman" is a "characteristic [that is] fundamental to [one's] individual identit[y]" that "cannot be changed." *See Matter of Kasinga*, 21 I&N Dec. 357, 366 (B.I.A. 1996). Other courts have similarly explained that "being . . . young" and of a particular gender are "common and immutable characteristic[s]." *See Cece v. Holder*, 733 F.3d 662, 672 (7th Cir. 2013) (en banc) (recognizing "particular social group" of "young women who are

---

[7] Importantly, the BIA could, and should, have followed the rule of *Crespin-Valladares* from the start — there was no need to wait for the Attorney General's vacatur of *L-E-A- II* to do so, the conflict between the two decisions notwithstanding. Decisions of the Attorney General are, to be certain, binding on the BIA. But *Crespin-Valladares* predated *L-E-A- II* by some eight years, and as the BIA has previously recognized, it is obliged to apply the precedent of the relevant court of appeals in cases arising within the associated circuit — even if the Attorney General or the BIA itself disagrees with that precedent. *See Matter of Anselmo*, 20 I&N Dec. 25, 25-32 (B.I.A. 1989); *see also Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003) ("The BIA must . . . follow the decisions of our court, and we will not defer to BIA decisions that conflict with circuit precedent."). When she awarded Garcia withholding of removal in December 2019, the IJ correctly recognized that "the Immigration Court remains bound by Fourth Circuit precedent despite the Attorney General's decision in *L-E-A-*," and accordingly, she went on to apply the *Crespin-Valladares* decision. *See* J.A. 1265.

17

targeted for prostitution by traffickers in Albania"). And in *Crespin-Valladares*, we identified "kinship ties" and "family bonds" as "paradigmatically immutable" and "innate and unchangeable." *See* 632 F.3d at 124. Evidently recognizing all of this, the Attorney General does not even defend the BIA's "immutability" analysis on appeal.

As to the "social distinction" or "visibility" factor, our *Crespin-Valladares* precedent admonishes that "few groups [are] more readily identifiable [in society] than the family," and indeed explains that "the BIA itself has previously stated that '[s]ocial groups based on innate characteristics such as . . . family relationship[s] are generally easily recognizable and understood by others to constitute social groups." *See* 632 F.3d at 125-26. Here, the BIA's "social distinction" analysis hinged entirely on the Attorney General's vacated *L-E-A- II* decision, which, again, was flatly inconsistent with our clear and conclusive ruling that "the family satisfies the BIA's visibility criterion." *Id.* at 125 n.5.

Lastly, in addressing the "particularity" requirement, the BIA concluded that Garcia's proposed group "lacks particularity because it possesses no narrowing attribute." *See* J.A. 967. The BIA criticized Garcia's group as being too "diffuse," *id.*, but we have repeatedly recognized family groups far more general than "young male family members of Emily" as sufficiently "particular" for purposes of an asylum or withholding of removal analysis. *See, e.g.*, *Crespin-Valladares*, 632 F.3d at 120-25 (accepting "family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses," specifically with respect to petitioner and his uncle, as an adequately "particularized" family group owing to its "well-defined boundaries"); *Salgado-Sosa*, 882 F.3d at 454, 457 (resolving that it was "clear" under *Crespin-Valladares* that petitioner's

18

"extended family" qualified as "particular social group"); *Cordova v. Holder*, 759 F.3d 332, 338 (4th Cir. 2014) (reversing BIA's final order of removal because of failure to assess social group based on kinship ties to rival gang members).   Contrary to the Attorney General's suggestion, there is no requirement in this circuit for a family-based "particular social group" to be limited to a nuclear family.  *See Salgado-Sosa*, 882 F.3d at 457. Strikingly, the BIA actually recognized that very proposition in its 2021 Reversal Order. *See* J.A. 967 ("[W]e do not doubt that a family-based group that extends to the 'cousins' of a particular relative can satisfy the particularity requirement.").  In short, the 18th Street Gang was clearly capable of discerning who was and was not a "young male family member" of Emily when it singled out Garcia for its merciless attacks.  And there is no reason we should not be able to make that distinction as well.  To conclude otherwise would require turning a blind eye.

Garcia's proposed "particular social group" is thus cognizable for purposes of weighing his application for withholding of removal, and the 2021 Reversal Order and ensuing Reconsideration Order must be reversed due to their erroneous rulings.  We recognize that, in rejecting Garcia's withholding claim, the BIA did not reach other aspects of the claim that the DHS had challenged on appeal.  That being so, we are constrained from directing an award of withholding of removal, but will instead remand for the BIA to further consider Garcia's withholding of removal claim, taking into account our rulings herein.

19

2.

Next, Garcia challenges the ruling of the IJ — affirmed by the BIA in its Dismissal Order — that he was not persecuted on account of his "imputed political opinion," requesting that we award withholding of removal on that alternative basis. We discern no reversible error on this contention, however, and so will not disturb either the IJ's ruling or the BIA's ruling in that regard.

In rejecting Garcia's "political opinion"-based withholding of removal claim in June 2021, the IJ ruled that Garcia had failed to establish that he was persecuted by the 18th Street Gang "on account of" any perceived political views regarding the gang's activities, and that he was instead targeted in retaliation for his interference with the gang's efforts to recruit his cousin Emily. That "nexus" ruling — going to whether Garcia's claimed protected status was "at least one central reason" for his persecution — represents a factual determination that we review for substantial evidence and treat as "conclusive unless the evidence . . . was such that any reasonable adjudicator would have been compelled to conclude to the contrary." *See Lizama*, 629 F.3d at 444. Further, where — as is the case here — "the BIA affirms the IJ's decision with an opinion of its own, we review both decisions." *See Salgado-Sosa*, 882 F.3d at 456.

We are satisfied that Garcia's testimony afforded the IJ "more than a mere scintilla" of evidence to determine that the gang's motive in targeting him was rooted in retaliation, and not in political strife. *See Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). During his 2019 IJ hearing, Garcia testified that when he returned to El Salvador in 2016, gang members told him that the gang "still ha[d] unfinished business" with him, that he was

20

"finally going to pay for what [he] did," and that "the gang takes its time but never forgets." *See* J.A. 1318, 1337. The IJ resolved that the gang's conduct indicated that it "viewed [Garcia's] action[s] as merely thwarting their attempt to abduct and forcibly recruit Emily," and the BIA agreed that the gang had not acted out of "a desire to overcome what they viewed as a political stance." *Id.* at 334, 397. To date, Garcia has adduced no compelling evidence — direct or circumstantial — that the gang understood his efforts to protect Emily as calling their authority into question or resisting their political influence.

In these circumstances, we affirm the BIA's Dismissal Order and its approval of the IJ's "political opinion" ruling. Because Garcia was not persecuted on account of an "imputed political opinion," the BIA is obliged, on remand, to assess his withholding of removal claim solely on the basis of his designated social group.

B.

Garcia interposes his final appellate challenge against the BIA's reversal of the IJ's award of CAT relief. In its 2021 Reversal Order, the BIA concluded that Garcia had failed to present sufficient evidence to establish that the Salvadoran government would "acquiesce" to any torture he might suffer if returned to El Salvador, thereby foreclosing the possibility of protection under the CAT. Garcia now contends that the BIA ignored most of the evidence offered in support of his CAT claim, and maintains that, properly considered, the evidence of record compels the conclusion that he will more likely than not be tortured in El Salvador. Accordingly, he seeks reinstatement of the IJ's CAT ruling.

An applicant for CAT protection is required to establish that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." *See*

8 C.F.R. § 1208.16(c)(2). "Torture" is "an extreme form of cruel and inhuman treatment" by which "severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity." *Id.* § 1208.18(a)(1)-(2). A petitioner seeking CAT protection may identify multiple potential sources of torture, so long as the aggregate risk of torture that he faces is above 50 percent. *See Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019). Consideration of a CAT claim requires assessment of "the full panoply of the risk-of-torture evidence submitted by" the petitioner, and "arbitrarily ignor[ing]" such evidence constitutes reversible error. *Id.* at 974-75.

In 2019, the IJ determined that Garcia would more likely than not be "tortured" by a combination of the 18th Street Gang, the Salvadoran police, and the "vigilante anti-gang death squads" if he were removed to El Salvador. *See* J.A. 1270. In support of that ruling, the IJ discussed the numerous attacks that Garcia had endured at the hands of those three groups; the impact that his criminal record from Virginia would have on his risk of harm in El Salvador; documentary evidence regarding the gangs' proclivity for continuing to assail their past victims, and gang operations in El Salvador generally; and Garcia's inability to be relocated to a "safer" part of El Salvador. *Id.* But in assessing the IJ's determination, the BIA afforded consideration to only two items of evidence — news articles from 2019 that the IJ had relied on in concluding that Salvadoran public officials would likely "acquiesce" to Garcia's torture. According to the BIA, the news articles provided an insufficient basis for the IJ's "acquiescence" ruling.

22

By so severely limiting the body of evidence that it considered in reviewing Garcia's CAT claim, the BIA failed to engage with "the full panoply" of evidence that Garcia had submitted. *See Rodriguez-Arias*, 915 F.3d at 975. It did not consult the types of evidence it was required by regulation to consider — including "[e]vidence of past torture" and "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal," *see* 8 C.F.R. § 1208.16(c)(3) — nor did it acknowledge Garcia's personal experiences that could have informed the "acquiescence" determination. The BIA made no mention of Garcia having been repeatedly subjected to "severe pain [and] suffering" when he was removed to El Salvador for the first time in 2016. *Id.* § 1208.18(a)(1). And critically, it ignored the attacks that the Salvadoran police themselves had carried out against Garcia — indicating that he had been tortured "by" public officials, such that no showing of "acquiescence" on their part was even necessary. *Id.* (stating that torture must be inflicted "by, *or* at the instigation of, *or* with the consent or acquiescence of, a public official" (emphases added)). In any event, our Court has resolved that "for many years, the Salvadoran government has not only acquiesced in acts of torture committed by non-state actors — such as gangs and vigilante groups — against current and former gang members, but also actively encouraged or committed torture itself." *See Quintero v. Garland*, 998 F.3d 612, 646 (4th Cir. 2021).

Put simply, the BIA declined to "interact seriously" with the record before it in reviewing Garcia's claim for CAT protection, and its failure in that regard requires a remand. *See Rodriguez-Arias*, 915 F.3d at 975 ("When a man's life is on the line, he is entitled to know that the court deciding his claim reviewed all his evidence, understood it,

and had a cogent, articulable basis for its determination that his evidence was insufficient."). Garcia's evidence, to be certain, is strongly supportive of his CAT claim — he has, after all, *already* been subjected to "cruel and inhuman treatment" after being initially removed to El Salvador. *See* 8 C.F.R. § 1208.18(a)(2). But we will today decline to resolve whether Garcia is entitled to CAT protection. Instead, we vacate the BIA's 2021 Reversal Order with respect to its CAT ruling and remand for the BIA to fully and properly assess Garcia's CAT claim in the first instance.

* * *

In closing, we recognize that Garcia's removal proceedings have languished before the IJ and the BIA — and now this Court — for more than six years, leaving him in limbo and presently in harm's way in El Salvador. We are also mindful that Garcia was only 15 years old when he sought to protect his cousin from the 18th Street Gang's advances, setting off more than a decade of hardship and uncertainty. With that, we emphasize the "strong public interest in bringing [this] litigation to a close . . . promptly." *See Hussain v. Gonzales*, 477 F.3d 153, 158 (4th Cir. 2007). And although we do not direct the affirmative award of any relief, we acknowledge the compelling case for protection that Garcia has made. If, on remand, the BIA affirms either the IJ's award of withholding of removal or the award of CAT relief, the DHS and the Attorney General should swiftly "facilitate [Garcia's] return to the United States" from El Salvador. *See Ramirez v. Sessions*, 887 F.3d 693, 706 (4th Cir. 2018) (directing the government to facilitate previously removed petitioner's return to the United States pursuant to an Immigration and Customs Enforcement Policy Directive). Moreover, if the BIA determines that Garcia's "presence

24

is necessary for continued administrative removal proceedings" on remand, the authorities should see to his prompt return. *Id.*

### III.

Pursuant to the foregoing, we grant Garcia's petition for review and reverse the BIA's 2021 Reversal Order and its Reconsideration Order with respect to the BIA's "particular social group" ruling. We separately affirm the BIA's Dismissal Order, and we vacate the 2021 Reversal Order with respect to the BIA's CAT ruling. Finally, we remand for prompt consideration of Garcia's claims for withholding of removal and protection under the CAT, and for such other and further proceedings as may be appropriate.

*PETITION FOR REVIEW GRANTED;*
*REVERSED IN PART, AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

QUATTLEBAUM, Circuit Judge, dissenting in part and concurring in part:[1]

Words matter. The words an alien seeking withholding of removal chooses to describe his proposed "particular social group" must satisfy the settled immutability, particularity and social distinction requirements. Otherwise, the alien's claim fails. And here, the words Christian Alberto Santos Garcia used to describe his purported group are fatal to his claim. According to Garcia, he fears persecution if he is returned to El Salvador on account of his membership in the group of "young male family members of his cousin Emily." J.A. 3. But that group lacks particularity and social distinction. The adjective "young" makes the group inescapably amorphous. Who is or is not young is subjective— it depends on who you ask. Because Garcia's proposed group has no objective boundaries, it lacks particularity. In addition, Garcia offered no evidence that Salvadoran society views "young male family members of his cousin Emily" as a socially distinct group. It is not enough for Garcia to show that people in his neighborhood know he is Emily's cousin; he must show that Salvadoran society views young male family members as a unique group. Because Garcia offered no evidence on this issue, he has failed his burden to show that his proposed group is socially distinct. So, because "young male family members of his cousin Emily" is neither particular nor socially distinct, it does not qualify as a legally valid particular social group.

---

[1] I join in Part II—A—2 of the majority opinion.

I.

As the majority notes, to be legally valid, a particular social group must meet three requirements. Its members must share common, immutable characteristics; it must be defined with sufficient particularity; and it must be socially distinct within the society in question. *Nolasco v. Garland*, 7 F.4th 180, 187 (4th Cir. 2021). Even assuming that young male family members of Garcia's cousin Emily satisfies the immutability requirement, it is neither particular nor socially distinct.

I begin with particularity. "Whether a [particular social group] satisfies the particularity requirement is [a] question of law, which we review de novo." *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021). The central question for particularity is whether a particular social group's boundaries are clear. *Id.* at 434. "Put another way, is it evident from the group's description who is in and who is not?" *Id.* To be evident, the proposed group must have "objective goalposts delineating the boundaries to the group." *Id.* at 435.

Because it includes the adjective "young," Garcia's proposed group lacks particularity.[2] It has no goalposts other than one's subjective view of the term. Ask ten people what it means to be young, and you'll get a variety of answers. Youth, like beauty, is "in the eye of the beholder."[3]

---

[2] Garcia's use of "young" also raises an immutability issue. After all, one's youth is temporary. But without deciding the issue, the BIA has questioned whether a characteristic that only changes over time and is out of one's control lacks immutability. *See Matter of S-E-G-*, 24 I. & N. Dec. 579, 583–84 (B.I.A. 2008).

[3] Margaret Wolfe Hungerford appears to have coined this phrase in her 1878 novel *Molly Bawn*. And views about youth or age have been scientifically documented to be (Continued)

27

Proving my point, the uncertainty of the word "young" played out at oral argument. Counsel for Garcia, in response to questions, said a 35-year-old might be young. Judge King pointed out that under the Federal Youth Corrections Act, those 26 and under are considered "young."[4] Without defining the term, who is—or is not—young depends on who you ask. *See In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 76 (B.I.A. 2007) (finding that the respondent's proposed social group "affluent Guatemalans" was too amorphous to provide an adequate benchmark in determining group membership, because it depended on a subjective perspective).

Imagine that Emily has five male family members. Their ages are 18, 25, 35, 45 and 55. Which ones are young? If you're 85, you might say all of them. If you are 10, you might say none. If you're in between, who knows? There are simply no objective boundaries to Garcia's proposed group.

My good colleagues in the majority conclude that the Board of Immigration Appeals' decision holding that Garcia's proposed group lacks particularity conflicts with our decision in *Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011). I agree that, under *Crespin-Valladares*, family members can be valid particular social groups. *See id.* at 120–25 ("[T]he family provides a prototypical example of a particular social group.")

---

inherently subjective. Emily Laber-Warren, *You're Only as Old as You Feel*, N.Y. Times, October 17, 2019. So, it makes sense that some identify with Bob Dylan who sang "Forever Young," but others side with Garth Brooks, who sang "Much Too Young (To Feel This Damn Old)."

[4] The Federal Youth Corrections Act was repealed in 1984 with the passage of the Sentencing Reform Act. *See* Pub. L. 98-473, ch. II, § 212(a)(2), 98 Stat. 1837 (1984).

28

(internal quotation marks and citation omitted). But "young male family members of Emily" is not the same as family members of Emily. Families have objective boundaries. To illustrate, a family tree will tell you who is and who is not in the family. In contrast, "young," without being defined, has no objective boundaries. Continuing with the family tree analogy, there is no way to know who on the family tree is young. And we have never held that any group involving family members is automatically particular no matter how the group is described.

To repeat, Garcia bears the burden of establishing that his particular social group is legally valid. *Lizama v. Holder*, 629 F.3d 440, 446 (4th Cir. 2011). Before the Immigration Judge and the Board, he described his group as young male family members of his cousin Emily. And before us, with able assistance of his counsel, he continues to press that description of the group.[5] As a result, we must assess particularity using his words. *See Zelaya v. Holder*, 668 F.3d 159, 166–67 (4th Cir. 2012) (holding "young Honduran males who refuse to join MS-13, have notified authorities of MS-13's harassment tactics and have an identifiable MS-13 tormenter" lacked particularity); *Lizama,* 629 F.3d at 447–48 (holding "young, Americanized, well off Salvadoran male deportees with criminal histories that oppose gangs" was not particular). We cannot redefine the group by ignoring the

---

[5] Garcia's inclusion of the modifier young was likely a calculated attempt to strengthen his position on the required nexus between his persecution and his membership in his proposed group. After all, there is no evidence that members of Emily's family generally were persecuted. The problem though is by attempting to strengthen his nexus argument, Garcia weakened his particularity and social distinction arguments to the point that his group is not legally cognizable.

adjective young. *See Crespin-Valladares*, 632 F.3d at 125 (acknowledging that the BIA erred when it considered an incorrect proposed particular social group rather than the one asserted by the petitioner). The inclusion of that adjective makes this case materially different from *Crespin-Valladares*.[6]

The majority also points out that "there is no requirement in this circuit for a family-based 'particular social group' to be limited to a nuclear family." Maj. Op. at 19. On this point, I agree. *Salgado-Sosa* makes this clear. But that does not mean that any group that includes members of one's extended family satisfies the particularity requirement regardless of the amorphous modifiers used.

Last, the majority reasons that "the 18th Street Gang was clearly capable of discerning who was and was not a 'young male family member' of Emily." Maj. Op at 19. Even if it is true—and, as discussed below, the record hardly supports this conclusion—it is legally irrelevant. Particularity is not a fact-based decision that considers whether the alleged persecutors could identify who was in the proposed group. It is a question of law that asks if the words used by the alien contain "objective goalposts delineating the boundaries to the group." *Amaya,* 986 F.3d at 435. The words used by Garcia do not.

"Young male family members of Emily" lacks particularity. It is inherently subjective. It has no objective boundaries. As a result, there is no way to know who is in it and who is not. For this reason, Garcia's alleged particular social group is not cognizable.

---

[6] The use of "young" also distinguishes Garcia's proposed group from the ones we approved in the other cases the majority cites: *Salgado-Sosa v. Sessions*, 882 F.3d 451 (4th Cir. 2018) and *Cordova v. Holder*, 759 F.3d 332 (4th Cir. 2014).

30

II.

Next up, social distinction. "Social distinction asks whether the home society actually does recognize that group as being a 'distinct' and identifiable group." *Amaya*, 986 F.3d at 433 (cleaned up). An alien seeking withholding relief must produce "evidence that society in general commonly considers persons sharing the particular characteristic to be a group." *Nolasco*, 7 F.4th at 187–88.

Garcia asserts he has met his burden of establishing that "young male family members of his cousin Emily" is a socially distinct group. But the only evidence that even comes close to this issue is Garcia's testimony that members of his community know his family because they came to his grandfather's store and saw who was working there. But no one testified at all about the purported particular social group of young male family members of his cousin Emily or how it is socially distinct. And even if they had done so, that is not how social distinction works. Garcia's analysis is flawed in at least two ways.

First, Garcia considers the wrong part of Salvadoran society. The relevant part of society that we consider is not a local neighborhood. Social distinction must be based on a larger part of society. *Nolasco*, 7 F.4th at 187–88; *see also Morales v. Garland*, 51 F.4th 553, 557–58 (4th Cir. 2022) (emphasizing that "[i]t is not enough that members of the proposed group see themselves as distinct. What matters is the view of Salvadoran society as a whole"). Garcia offered no evidence how Salvadoran society beyond his neighborhood viewed his proposed social group.

31

Second, Garcia misconstrues the way social distinction is evaluated. The issue is not whether others knew Emily's young male family members.[7] The issue is whether society considers the young male family members generally as a distinct group. In other words, does society recognize young male family members, whether they are relatives of Emily or anyone else, as a category of people?

To explain, as already discussed, we have held that "family" is a socially distinct group. *See Crespin-Valladares*, 632 F.3d at 124–25. That makes sense. When you meet someone with a last name that is the same as someone you know, you might ask, "are you related to the Smiths down the road?" But that does not mean we view those with characteristics that some family members may share as necessarily a socially distinct group. Take members of the Smith family with short hair, for example. As a matter of fact, there may be members of the Smith family with short hair. But that does not mean society views the people who meet that description as an actual distinct group. So, our question here is whether Garcia has offered proof, because it is his burden to do so, that Salvadoran society actually views young male family members as a distinct group. And Garcia offered no evidence on this point.

---

[7] Even in asking the wrong question, Garcia's proposed group does not qualify. "Young male family members of his cousin Emily" is not limited to those who live in Garcia's neighborhood and work in his grandfather's grocery store. As proposed, it includes young male relatives wherever they live. So, even if people in the neighborhood might recognize Emily's young male relatives that also live in the neighborhood, Garcia offers no evidence or argument that those in the neighborhood also would recognize young male relatives of Emily who might live elsewhere. And whether or not all Emily's young male cousins may have lived in the neighborhood does not matter. Garcia defined his proposed group without limiting it to local young male relatives. We are not to redefine it.

32

Garcia failed to meet his burden to show that his proposed group is socially distinct. So, for this separate and independent reason, he has not advanced a cognizable particular social group.[8]

III.

In seeking withholding relief based on persecution on account of membership in a particular social group, Garcia must satisfy the immutability, particularity and social distinction requirements. We must evaluate whether or not he did so based on the words he used to describe the group. We are not to redefine the group or ignore parts of it to

---

[8] Although I agree it is a closer call, I would also deny Garcia's petition for review of his Convention Against Torture claim. Garcia argues that the BIA only considered two pieces of evidence he introduced to show that he will more likely than not be tortured if he returns to El Salvador with the consent or acquiescence of the Salvadoran government. True, the BIA only specifically discussed two of the pieces of evidence Garcia introduced. But the two articles the BIA discussed were highlighted by the Immigration Judge. It seems to me that the BIA's discussion of those two articles was more of a response to the Immigration Judge's reliance on them than an indication that its analysis was limited to that evidence. In fact, other parts of the opinion indicate the BIA was considering all of the evidence Garcia introduced. For example, the BIA stated, "we conclude that the evidence relied on by the Immigration Judge does not establish that any Salvadoran public official will 'acquiesce' in the respondent's torture." J.A. 969. That language suggests all the evidence, not just some of it. And it later stated, "while we acknowledge that violence—committed by both gangs and those opposed to them—remains a serious problem in El Salvador, the evidence cited by the Immigration Judge simply does not demonstrate that the response of public officials to any harm *this particular respondent* might experience will more likely than not constitute 'acquiescence' (to include willful blindness)." J.A. 970. Again, this appears to refer to all, not some, of the evidence before the Immigration Judge. In fairness, the BIA could have been more thorough. But it is not required to specifically discuss every piece of evidence. *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014). And we must presume the BIA considered all the evidence unless there is evidence it did not. *Martinez v. Holder*, 740 F.3d 902, 914 (4th Cir. 2014). Against that standard, I would deny Garcia's CAT challenge as well.

overcome its flaws. Doing that here, Garcia's proposed group of young male relatives of his cousin Emily is not legally valid. It is neither particular nor socially distinct. I respectfully dissent.